RAMSEY ET AL., DBA LEON NUNLEY COAL CO., ET AL. *v.* UNITED MINE WORKERS OF AMERICA

No. 88.   Argued December 7, 1970—Decided February 24, 1971

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, and BLACKMUN, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BLACK, HARLAN, and MARSHALL, JJ., joined, *post,* p. 314.

*John A. Rowntree* argued the cause for petitioners. With him on the briefs were *Clarence E. Walker, William M. Ables, Jr., Sizer Chambliss,* and *A. Allan Kelly.*

*Edward Bennett Williams* argued the cause for respondent. With him on the brief were *Steven M. Umin, Edward L. Carey, Harrison Combs, Willard P. Owens, E. H. Rayson,* and *M. E. Boiarsky.*

*Guy Farmer* filed a brief for the Bituminous Coal Operators' Association as *amicus curiae* urging affirmance.

Mr. Justice White delivered the opinion of the Court.

Petitioners, coal mine operators in southeastern Tennessee, were plaintiffs in the trial court, where their complaint accused respondent United Mine Workers of America of violating the Sherman Act by conspiring with various coal producers to drive petitioners out of business. The major thrust of the claim was that the Union had expressly or impliedly agreed with the major producers to impose the provisions of the National Bituminous Coal Wage Agreement (NBCWA), first executed by the Union and certain companies in 1950, on all coal mine operators, knowing that small and nonmechanized operators would be unable to meet the contract's terms. The purpose of this alleged conspiracy was to eliminate the marginal operators, control production, and reserve the market for larger concerns. The claim of express agreement rested on the so-called Protective Wage Clause (PWC) added to the NBCWA by amendment in 1958. The PWC, after reciting that the parties agreed that coal mines "shall be so operated as not to debase or lower the standards of wages, hours, safety requirements and other conditions of work, established by this contract," provided as follows:

"During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor will it permit any agreement or understanding covering any wages, hours or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and

exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto."[1]

Petitioners in any event claimed that a conspiratorial arrangement between the Union and the major operators could be implied from the PWC, the course of negotiations between the Union and those operators from 1950 forward,[2] and the ensuing organizational and strike activity against petitioners and other southeastern Tennessee operators aimed at securing agreement to and compliance with the National Agreement as amended from time to time, as well as from the Union's purchase of a controlling interest in West Kentucky Coal Co. and the latter's allegedly predatory pricing in the TVA coal market.

---

[1] In return the operators agreed "that all bituminous coal mined, produced, or prepared by them, or any of them, or procured or acquired by them or any of them under a subcontract arrangement" should be produced under terms and conditions which are as favorable to the employees as those provided for in this contract.

In another case, *Tennessee Consolidated Coal Co.* v. *UMW*, 416 F. 2d 1192 (CA6 1969), the Court of Appeals stated that the Protective Wage Clause was a "quid pro quo" for the foregoing undertaking of the operators which was described by the court as an agreement "to boycott coal not produced in conformity with the national agreement." 416 F. 2d, at 1198.

[2] The Bituminous Coal Operators Association (BCOA) was formed as a multi-employer collective-bargaining unit in 1950, just after signing of the 1950 NBCWA. Member employers ranged from the small to the large, though its members mined about 50% of U. S. bituminous coal. It formed a "negotiating committee" analogous to the UMW's "policy committee," to represent member employers at the bargaining table. *Ramsey* v. *UMW*, 265 F. Supp. 388, 407 (ED Tenn. 1967). Relations between union and management improved greatly during the 1950's, leading petitioners to suggest that the absence of strife indicated the rise of the conspiracy. *Id.,* at 407–408.

Following a trial to the court on a voluminous record, the trial judge wrote an extensive opinion containing his findings and conclusions leading to a dismissal of the case for failure of proof. *Ramsey* v. *UMW*, 265 F. Supp. 388 (ED Tenn. 1967). He interpreted the PWC as forbidding departure from the contract terms by the Union only where signatories were concerned; the court found nothing in the contract obligating the Union to insist on comparable terms when dealing with employers outside the bargaining unit. As for an implied conspiracy to standardize employment terms throughout the industry aimed at destroying marginal producers, the trial court said that "[w]ere this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the U. M. W. did so impliedly agree," but that "the standard of proof where a labor union is involved is 'clear proof,' as required by Section 6 of the Norris-LaGuardia Act, a standard different from the ordinary civil burden of persuasion." [3] 265 F. Supp., at 412. Judged by this stricter standard, proof of conspiracy was found wanting and the case against the Union failed.

A panel of the Court of Appeals ruled the trial court had erred in applying the clear-evidence standard but rehearing *en banc* was granted. The Court of Appeals then agreed with the District Court's construction of the PWC but with respect to the clear-evidence standard, four judges agreed with the trial judge and four disagreed. The latter insisted that the ordinary preponderance-of-evidence standard was applicable in civil antitrust actions against labor unions except with respect to proving the authority of individual members, officers, and agents of

---

[3] The court later said, "Did not the clear evidence rule apply, the Court might have reached a different conclusion upon certain issues." 265 F. Supp., at 434.

the Union to perform the acts complained of on behalf of the Union. The District Court's judgment was therefore affirmed by an equally divided court. *Ramsey* v. *UMW,* 416 F. 2d 655 (CA6 1969). We granted certiorari. 397 U. S. 1006 (1970).

## I

In a section of his opinion entitled "Legal Guidelines," the District Judge inquired as to "the standard of proof that must govern a proceeding involving a Sherman Act charge against a labor union." His answer was: "The burden of proof borne by the plaintiff is not the usual preponderance of the evidence rule applicable in civil cases generally. The requirement imposed by Section 6 of the Norris-LaGuardia Act is that of 'clear proof' where a labor organization is a party to an action such as this. . . . That the 'clear proof' standard applies to an action wherein a labor organization is sought to be charged with a Sherman Act violation appears settled." 265 F. Supp., at 400. In this and other passages in the trial judge's opinion,[4] he apparently demanded clear proof rather than a preponderance of the evidence not only with respect to the authority of the individuals who were alleged to have performed certain illegal acts on behalf of unions, but also as to whether the acts themselves occurred, whether the acts proved amounted to a conspiracy and whether plaintiffs' businesses had been injured. The eight judges of the Court of Appeals also seemed to read the trial court as having given unlimited application to the clear-proof standard in this action. Apparently they were also convinced that the standard applied by the trial court had made a critical difference in the case, for the issue that equally divided them was whether the clear-proof standard should be

---

[4] See n. 3, *supra,* and accompanying text.

applied to any matters other than the Union's authorization of the conduct alleged and proved.[5]

The reasoning of the lower courts in departing from the usual preponderance-of-evidence rule generally applicable to civil actions in federal courts [6] was rooted in § 6 of the Norris-LaGuardia Act, 47 Stat. 71, 29 U. S. C. § 106. But the trial judge and four judges of the Court of Appeals read far too much into § 6, which provides as follows:

> "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be

[5] The Union urges not only that the trial court properly understood the limited scope of § 6 but also that on most if not all significant issues the proof failed even under the preponderance-of-evidence rule. For the first proposition the Union relies on the trial judge's instructions to the jury in a later case, which are reported in *Tennessee Consolidated Coal Co.* v. *UMW*, 416 F. 2d, at 1200–1203, and which are said to construe § 6 more narrowly. But we must decide the case before us, not some other one in which the trial court may have evidenced different views. Here the Union's claim is belied by the language of the trial court's opinion and its interpretation by the eight judges of the Court of Appeals. The second proposition—that the trial court's clear-evidence ruling was mere dictum—leaves unexplained the Court of Appeals' affirmance by an equally divided court as well as the trial judge's remarks that he would or might have reached different results on some issues, apparently including some aspects of the conspiracy issue, if preponderance of the evidence was the governing standard. To what extent the proof would fail under the standard we here hold applicable and what legal difference it might make are matters open to be dealt with on remand. We do note from the trial court's opinion that except for violence and some picketing, issues of union responsibility for acts alleged and proved were nonexistent or played little part in the thinking of the trial judge.

[6] "In civil cases [the fact finder's] duty is to weigh the evidence carefully, and to find for the party in whose favor it preponderates . . . ." *Lilienthal's Tobacco* v. *United States*, 97 U. S. 237, 266 (1878).

> held responsible or liable in any court of the
> United States for the unlawful acts of individual
> officers, members, or agents, except upon clear proof
> of actual participation in, or actual authorization of,
> such acts, or of ratification of such acts after actual
> knowledge thereof."

Judge O'Sullivan cogently observed in the Court of Appeals that: "This is plain language which . . . clearly exposes the Section's limitation." 416 F. 2d, at 667. On its face § 6 is not addressed to the quantum of evidence required to prove the occurrence of the alleged "unlawful acts." It is concerned only with requiring "clear proof" that the person or organization charged actually participated in, authorized, or ratified "such acts." Nothing in the words of the section suggests that a new and different standard of proof was being prescribed for all issues in actions against a union, its members or its officers involved in a labor dispute. The section neither expressly nor by implication requires satisfaction of the clear-proof standard in deciding factual issues concerning the commission *vel non* of acts by union officers or by members alleged to constitute a conspiracy, or the inferences to be drawn from such acts, or concerning overt acts in furtherance of the conspiracy, the impact on the relevant market or the injury to plaintiffs' businesses.

The legislative history of § 6 was reviewed at length in *United Brotherhood of Carpenters* v. *United States,* 330 U. S. 395 (1947). We have reviewed it again and we find nothing to suggest that the section means something different from what its language seems to say.[7] Without laboring the matter—since nothing to the contrary in the legislative history has been presented to us—

---

[7] As we noted in *United Mine Workers* v. *Gibbs,* 383 U. S. 715, 736 n. 26 (1966), the fullest statement concerning the basis and impact of § 6 is found in S. Rep. No. 163, 72d Cong., 1st Sess., 19–21.

the simple concern of Congress was that unions had been found liable for violence and other illegal acts occurring in labor disputes which they had never authorized or ratified and for which they should not be held responsible. Congress discerned a tendency in courts to blame unions for everything occurring during a strike. Nor was the problem necessarily limited to labor unions.[8] The straightforward answer was § 6, with its requirement that when illegal acts of any individual are charged against one of the major antagonists in a labor dispute—whether employer or union—the evidence must clearly prove that the individual's acts were authorized or ratified. See *id.,* at 403. We find no support in the legislative material for the notion that Congress intended broadly to modify the standard of proof where union and employer are sued separately or together in civil actions for damages incurred in the course of labor disputes.

Prior cases in this Court relied on by the courts below are not to the contrary. *Carpenters'* major concern was § 6. The Court there said that "[t]he limitations of that section are upon all courts of the United States in all matters growing out of labor disputes, covered by the Act, which may come before them." *Id.,* at 401. The statement is unexceptionable—the federal courts, of course, must heed § 6 in all cases arising out of labor disputes in which the section is applicable.[9] However, the limitations the section imposes are those that the section describes. It is clear from the remainder of

---

[8] "Moreover, it will be observed that this section . . . applies both to organizations of labor and organizations of capital." *Id.,* at 19.

[9] The "more stringent standards" of § 6 were modified by Congress for purposes of the Labor Management Relations Act. *United Mine Workers* v. *Gibbs,* 383 U. S. 715, 736 (1966). See National Labor Relations Act, as amended, § 2 (13), 61 Stat. 139, 29 U. S. C. § 152 (13); Labor Management Relations Act, 1947, §§ 301 (e), 303 (b), 61 Stat. 157, 159, 29 U. S. C. §§ 185 (e), 187 (b).

the *Carpenters* opinion that § 6 deals only with proving the authority of individuals or organizations who act for another. Indeed, the Court there reversed a judgment against a union because the trial court had failed to instruct that illegal acts could not be proved against the union unless the evidence clearly showed the union had authorized, participated in, or ratified the commission of those acts.

*United Mine Workers* v. *Gibbs*, 383 U. S. 715 (1966), insofar as it dealt with § 6, was concerned only with the failure of the evidence clearly to show union responsibility for illegal acts of violence. There was no suggestion in that case that § 6 had broader scope. And § 6 was not even involved in *United Mine Workers* v. *Pennington*, 381 U. S. 657 (1965), as it came to this Court. The section was neither cited nor discussed and there were no indications that our passing reference, 381 U. S., at 665, to forfeiture of union exemption from antitrust liability when union connivance with employers is clearly shown was intended to establish a stricter standard of proof in actions charging labor unions with violations of the Sherman Act.

In our view, § 6 requires clear and convincing evidence only as to the Union's authorization, participation in, or ratification of the acts allegedly performed on its behalf. Nor do we discern any basis for our fashioning a new standard of proof applicable in antitrust actions against labor unions. Accordingly, the District Court erred in requiring petitioners' compliance with the standard of § 6 in proving other elements of their treble-damage case against the Union.

## II

Petitioners argue two other matters. We are urged to construe the PWC as itself being an illegal bargain for which the Union is not exempt under the antitrust

laws. The thrust of the argument in this Court is that by 1958, when the PWC was first agreed to by the Union and the BCOA, the Union had executed the national contract with hundreds of different bargaining units in addition to those represented by the BCOA. Even if the PWC bound the Union only to insist on identical contract terms as against "signatories," the effect of the clause, it is urged, was to bind the Union to the same contract, *ad infinitum*, with many and different bargaining units; the Union was no longer free to agree to different terms with any previous signatory to the NBCWA.[10] We find no reference to this aspect of the case in the opinions in the District Court and the Court of Appeals. We are unsure whether it was presented below and whether, in any event, there is record support for it. Accordingly, we deem it inappropriate to consider it in the first instance.

Finally, petitioners in effect ask us to reconsider our holding in *Pennington* and other cases that under the Clayton and Norris-LaGuardia Acts the Union incurs no liability under the antitrust laws when it concludes "a

---

[10] From the opinion of the District Court it appears that George Ramsey, one of the petitioners, "was a signatory to the National Bituminous Coal Wage Agreement from the time he began operations [in 1954] until 1960. In 1958 he was sued by the Welfare Fund for non-payment of royalties and the following two years his payments to the Welfare Fund exceeded his profits. In fact, he lost money in 1960. In that year his employees withdrew from the U. M. W. and joined the Southern Labor Union and he terminated his U. M. W. contract." 265 F. Supp., at 428. Other companies refused to sign the National Contract and negotiated for modifications. "[O]n December 26, 1962, the miners in most of the Southeastern Tennessee coal field ceased working. . . . While it does not appear that the U. M. W. called the strike, it is clear that it sanctioned and approved the strike." *Ibid.*

wage agreement with the multi-employer bargaining unit . . . and . . . as a matter of its own policy, and not by agreement with all or part of the employers of that unit, seek[s] the same wages from other employers." 381 U. S., at 664. This we decline to do. The Court made it unmistakably clear in *Allen Bradley Co.* v. *Union,* 325 U. S. 797, 811 (1945), that unilateral conduct by a union of the type protected by the Clayton and Norris-LaGuardia Acts does not violate the Sherman Act even though it may also restrain trade. "[T]hese congressionally permitted union activities may restrain trade in and of themselves. There is no denying the fact that many of them do so, both directly and indirectly." But "the desirability of such an exemption of labor unions is a question for the determination of Congress." 325 U. S., at 810. We adhere to this view. But neither do we retreat from the "one line which we can draw with assurance that we follow the congressional purpose. We know that Congress feared the concentrated power of business organizations to dominate markets and prices. . . . A business monopoly is no less such because a union participates, and such participation is a violation of the Act." *Id.,* at 811. Hence we also adhere to the decision in *Pennington:* "[T]he relevant labor and antitrust policies compel us to conclude that the alleged agreement between UMW and the large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws." 381 U. S., at 669. Where a union, by agreement with one set of employers, insists on maintaining in other bargaining units specified wage standards ruinous to the business of those employers, it is liable under the antitrust laws for the damages caused by its agreed-upon conduct.

We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK, MR. JUSTICE HARLAN, and MR. JUSTICE MARSHALL concur, dissenting.

This phase of this protracted litigation involves quite a different problem than the one presented in *United Mine Workers* v. *Pennington,* 381 U. S. 657. *Pennington* involved the question whether § 20 of the Clayton Act, 38 Stat. 738, and § 4 of the Norris-LaGuardia Act, 47 Stat. 70, under the complaint there made exempted the United Mine Workers from liability under the antitrust laws. That was recognized as the single issue. *Id.,* at 661–666. The Court said, "[W]e think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units." *Id.,* at 665.

The question in this case involves not the scope of the exemption but whether the Sherman Act has been violated. As we said in *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 512, "[A]ctivities of labor organizations not immunized by the Clayton Act are not necessarily violations of the Sherman Act."

A union-employer agreement to force other employers out of business causes the union to lose its exemption. But the fact that a union may be sued under the Sherman Act does not mean that it is necessarily liable. The question in the present case is, indeed, only one phase of the alleged Sherman Act violation. It solely concerns the kind of proof needed.

This phase of the litigation turns on the meaning of § 6 of the Norris-LaGuardia Act, 47 Stat. 71, 29 U. S. C. § 106, which provides:

> "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

The Court says that: "On its face § 6 is not addressed to the quantum of evidence required to prove the occurrence of the alleged 'unlawful acts.'" I respectfully disagree.

Unions usually act through officers, members, or agents, not as a body. Their liability is therefore vicarious; and Congress was anxious to safeguard, curtail, and limit it. The "clear proof" required was not restricted to "clear proof" of authority to act or "clear proof" of agency or "clear proof" of other "authorization." The "clear proof" was "clear proof" of authority to commit "the unlawful acts." The "clear proof" required was "clear proof" of "actual participation" in the "unlawful acts." The "clear proof" required was "clear proof" of the "ratification" of the "unlawful acts."

Authorization to perform those "unlawful acts" like ratification of them or participation in them must, if § 6 is to be given full vitality, be based on "clear proof" that the union had full complicity in the scheme.[1] It is in

---

[1] That was our construction of § 6 in *United Brotherhood of Carpenters* v. *United States*, 330 U. S. 395, 410–411. That construction provoked Mr. Justice Frankfurter to say in dissent: "Practically

my view a drastic rewriting of § 6 to conclude as does the Court that: "The straightforward answer was § 6, with its requirement that when illegal acts of any individual are charged against one of the major antagonists in a labor dispute—whether employer or union—the evidence must clearly prove that the individual's acts were authorized or ratified."

United Mine Workers and BCOA (Bituminous Coal Operators Association) entered into an industry-wide wage agreement in 1958 which provided wage scales for employees of all "signatory operators" of coal lands or leases.

It is argued that this agreement constituted an agreement by United Mine Workers to impose the wage scale on all nonsignatory coal operators in order to force some (including petitioners) out of business. If that was the agreement then, as I said in *Pennington* (381 U. S., at 674), the union would have lost its exemption. But there is not a word in the agreement, as I read it, that covers nonsignatory operators.

---

speaking, the interpretation given by the Court to § 6 serves to immunize unions, especially the more alert and powerful, as well as corporations involved in labor disputes, from Sherman Law liability. To insist that such is not the result intended by the Court is to deny the practical consequences of the Court's ruling." *Id.,* at 422.

Yet, as S. Rep. No. 163, 72d Cong., 1st Sess., 19, said respecting § 6: "Opposition to this section has been voiced on the ground that it seeks to establish a 'new law of agency.' In the first place, this section is concerned especially with establishing a rule of evidence. There is no provision made relieving an individual from responsibility for his acts, but provision is made that a person shall not be held responsible for an 'unlawful act' except upon 'clear proof' of participation or authorization or ratification." And see H. R. Conf. Rep. No. 793, 72d Cong., 1st Sess., 6; H. R. Conf. Rep. No. 821, 72d Cong., 1st Sess., 6.

It is, however, contended that even though there is no express commitment to drive marginal operators out of business, there was a conspiracy between BCOA and United Mine Workers to impose a wage scale upon the total industry which had the purpose and effect of driving the small, marginal operators out of business.

On this issue of the case, Judge Wilson of the District Court ruled:

> "Were this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the U. M. W. did so impliedly agree. However, the standard of proof where a labor union is involved is 'clear proof,' as required by Section 6 of the Norris-LaGuardia Act, a standard different from the ordinary civil burden of persuasion. United Brotherhood of Carpenters v. United States, 330 U. S. 395 . . . ; United Mine Workers v. Gibbs, 383 U. S. 715 . . . . The Court is of the opinion that the evidence upon the record in this case does not establish such clear and unequivocal proof as to warrant the Court in finding that the U. M. W. pursued its policy of uniformity of wage and labor standards by agreement with one or more employers, as distinguished from pursuing such policy upon its own. The only direct evidence in the record is to the effect that the Union pursued such policy upon its own, and not in agreement with any employer." 265 F. Supp. 388, 412.

The action of United Mine Workers officials in agreeing to the wage clause was the action of fully authorized agents. If that is all that the "clear proof" of § 6 requires, the case would be easy. For then it would be immaterial whether "clear proof" of an illegal purpose

or "preponderance of the evidence" were the test, for whichever were required, there would be no difference. If therefore "clear proof" is to set labor-antitrust cases apart from the rest—as it clearly was designed to do—it must embrace a union program to impose a wage scale on the entire industry with the purpose and effect of driving the small, marginal operators out of business.

Judge Wilson of the District Court and eight members of the Court of Appeals have reviewed the evidence in detail. While they agree that a case against the union has been made out if "preponderance of the evidence" is the test, none has suggested that the "clear proof" test has been satisfied if it is to mean more than "clear proof" of an agency relation.

In *United Mine Workers* v. *Gibbs,* 383 U. S. 715, 739, we spoke of the effect of § 6 in a case where the union is charged with the damages flowing from violence:

> "What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force."

If in *Gibbs* union officials were authorized to talk with employers and to protest certain issues that threatened the union's interests, would the union be liable if the protest became so heated that it erupted into violence? Certainly not. Authorization to use dynamite in the protest would be "clear proof"; authorization to carry dynamite for a lawful purpose would certainly not be "clear proof" of the authorization to use the dynamite to destroy an employer's business.

In the present case, authorization of union officials to use their best efforts to get an industry-wide wage scale

does not necessarily include authorization to drive some employers out of business. As Mr. Justice Goldberg pointed out in *Meat Cutters* v. *Jewel Tea*, 381 U. S. 676, 697 *et seq.*, there is obviously nothing illegal *per se* about industry-wide collective bargaining.[2] A particular agreement becomes vulnerable under the antitrust laws only if there is "clear proof" that the purpose of the union [3]

---

[2] Mr. Justice Goldberg said: "This history also shows that labor contracts establishing more or less standardized wages, hours, and other terms and conditions of employment in a given industry or market area are often secured either through bargaining with multi-employer associations or through bargaining with market leaders that sets a 'pattern' for agreements on labor standards with other employers. These are two similar systems used to achieve the identical result of fostering labor peace through the negotiation of uniform labor standards in an industry." 381 U. S., at 722.

[3] In the prior Congress a measure like § 6 was introduced. It is described in S. Rep. No. 1060, pt. 2, 71st Cong., 2d Sess., 18–19: "[W]hy should an officer of a labor union, who has specifically advised members that violence must be avoided, become responsible for the hot-headed action of some member in perhaps assaulting a strike breaker? Again, the relationship between officers and members of labor unions and other members is not that of employer and employee. The officers chosen by a union are not employers of the membership. They have no control over their associates based upon the power of determining whether or not they will employ them. It may be accepted that if a group associated in common activities becomes controlled by a lawless majority, it may be necessary for law-abiding men to dissolve their association with lawbreakers; but the doctrine that a few lawless men can change the character of an organization whose members and officers are very largely law-abiding is one which has been developed peculiarly as judge-made law in labor disputes, and it is high time that, by legislative action, the courts should be required to uphold the long established law that guilt is personal and that men can only be held responsible for the unlawful acts of associates because of participation in, authorization or ratification of such acts. As a rule of evidence, clear proof should be required, so that criminal guilt and criminal responsibility should not be imputed but proven beyond reasonable doubt in order to impose liability."

was not to advance the coal miners' interests but to do in one or more operators.

By the same reasoning we should ask here: Was there "clear proof" that the union approved a plan to drive small, marginal operators out of business?

Since on this record no one has suggested that there is such "clear proof," the judgment of the District Court should be affirmed.