Charles P. **MAHONEY**, Plaintiff, Appellee,

v.

Frank J. **TRABUCCO,** Commissioner, **Massachusetts Department of Public Safety, et al., Defendants, Appellants.**

No. 83–1862.

United States Court of Appeals, First Circuit.

Argued March 8, 1984.

Decided July 2, 1984.

H. Reed Witherby, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Thomas A. Barnico, Asst. Atty. Gen., Boston, Mass., Government Bureau, were on brief, for defendants, appellants.

E. David Wanger, Elizabeth K. Boyer and Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, Mass., on brief for State Police Ass'n of Mass., amicus curiae.

Wayne B. Hollingsworth, Boston, Mass., with whom Theresa A. Kelly and Hollingsworth & Associates, Boston, Mass., were on brief, for plaintiff, appellee.

Before COFFIN and BOWNES, Circuit Judges, and GIERBOLINI,* District Judge.

COFFIN, Circuit Judge.

Defendants-appellants, Frank J. Trabucco, Commissioner, Massachusetts Department of Public Safety, and the Massachusetts State Board of Retirement, appeal a judgment finding that the Commonwealth violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, by mandatorily retiring plaintiff-appellee, Massachusetts State Police Sergeant Charles P. Mahoney, at age 50 pursuant to Mass.Gen.Laws ch. 32, § 26(3)(a). 574 F.Supp. 955.

Massachusetts divides its state police force of somewhat more than 1,000 persons into a uniformed branch and non-uniformed branch. Members of the former receive a pension after twenty years service, which is more generous than that provided all other state employees. Mass.Gen.Laws Ann. ch. 32, § 26(3). They are also entitled, by virtue of Mass.Gen.Laws ch. 32, § 94, to a presumption that any heart-related disability is job-related for disability retirement purposes. But they are also required to retire at age 50. Mass.Gen.Laws Ann. ch. 32, § 26(3)(a).[1] It is this requirement that is challenged in the case at bar.

Plaintiff-appellee, a veteran sergeant of the uniformed branch of the state police with over 26 years of service, reached his 50th birthday on September 15, 1983. Upon being notified that he had to retire on that date, he brought suit against defendants charging that his forced retirement under § 26(3)(a) would violate the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634.

Massachusetts claims that age 50 is a bona fide occupational qualification (BFOQ) for state police officers and that Mahoney's mandatory retirement was authorized under that section of the ADEA which provides:

"(f) It shall not be unlawful for an employer, employment agency, or labor organization—

(a) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section *where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business,* or where the differentiation is based on reasonable factors other than age[.]"

29 U.S.C. § 623(f)(1) (emphasis added).

The district court, after a trial, issued a thoughtful opinion, concluding that Mass.

---

* Of the District of Puerto Rico, sitting by designation.

1. This statute provides:
   "Any member in service classified in Group 3 who is an officer appointed under section nine A of chapter twenty-two and who has performed service in the division of state police in the department of public safety for not less than twenty years, shall be retired by the state board of retirement upon his attaining age fifty or upon the expiration of such twenty years, whichever last occurs."
   Since another Massachusetts statute, Mass. Gen.Laws ch. 22 § 9A, has for many years prohibited the recruitment into the uniformed branch of those who have "passed" their thirtieth birthday, the practical effect of this statute is to require all members of the uniformed branch to retire at age 50.

Gen.Laws ch. 32 § 26(3)(a) is invalid as applied to plaintiff and that defendants must be enjoined from enforcing the statute against him "so long as he continues to work at his current assignment."

The court began by noting the generally accepted standard for evaluating the adequacy of a BFOQ defense as set forth in *Usery v. Tamiami Tours, Inc.,* 531 F.2d 224, 235–36 (5th Cir.1976), and *Orzel v. City of Wauwatosa Fire Dept.,* 697 F.2d 743, 753 (7th Cir.1983). Under that standard an employer must show that the age qualification is "reasonably related to the 'essential operation' of its business, *and* must demonstrate, *either* that there is a factual basis for believing that all or substantially all persons above the age limit would be unable to effectively perform the duties of the job, *or* that it is impossible or impracticable to determine job fitness on an individualized basis." *Orzel,* 697 F.2d at 753 (emphasis original) (footnote omitted).

Addressing the first part of this test, the court found the age requirement was reasonably related to the state police function of protection of persons, property, law and order, as indicated by *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (holding that the Massachusetts state police mandatory retirement age did not violate the equal protection clause). Then, after considering the testimony of a number of witnesses, the court concluded that both the second and third prongs of the test had been met for members of the uniformed state police "generally". It held:

> "Uncontradicted medical testimony indicates that all or substantially all 50 year-olds could not safely and effectively perform the duties of a State Police officer. In addition, uncontradicted medical evidence indicates that it is impracticable or impossible for the Commonwealth to make individual determinations of an officer's fitness to serve on the State Police after age 50."

The court then turned its attention to the meaning of "duties of the job", and, following the approach of the Eighth Circuit in *E.E.O.C. v. City of St. Paul,* 671 F.2d 1162 (8th Cir.1982), rather than that of the Seventh Circuit in *E.E.O.C. v. City of Janesville,* 630 F.2d 1254 (7th Cir.1980), decided that "the policies of the ADEA are best effected by evaluating the Commonwealth's BFOQ defense against the requirements of the job that Sergeant Mahoney has actually performed in the past and is likely to perform in the future", rather than the duties performed by uniformed state police officers generally.

Sergeant Mahoney, a 26 year veteran of the State Police, has spent the last 14 years at the Boston headquarters in an administrative capacity as liaison officer to a unit, headed and staffed by civilians, that collects and exchanges computerized criminal justice information with other law enforcement agencies, both within and outside Massachusetts. He also trains other officers in the use of the police telecommunications system. His work week is from 8:25 a.m. to 5:00 p.m., Monday through Friday. He occasionally volunteers for an overtime shift. He carries a gun, but wears civilian clothes. He is subject to reassignment and may be called to perform traditional police duties in the event of an emergency. During his service in this administrative post he has been called to special duty several times. He was assigned road duty for six weeks in 1972, he worked as a "radio man" at two prison disturbances in the early 1970's, and he performed communications duties during the visit of the "Tall Ships" in 1976, the "Blizzard of 1978", and the visit of Pope John Paul II in 1980. Although he weighs some 255 pounds, and has a mild arthritic condition, he has never failed a biennial physical examination.

Based on this record, medical testimony that plaintiff's age is no barrier to the performance of his administrative duties, the likelihood that plaintiff would not be assigned to other duty, and the "bare possibility that the plaintiff may be called upon to perform strenuous physical activity in an emergency", the court held that the Com-

monwealth had failed to satisfy the BFOQ defense.

We begin our own analysis by observing the implications of the district court's approach. On the one hand, the whole idea of a BFOQ is to carve out a limited occupational field where an employer may enforce a retirement age requirement, free from the duty of making individual judgments, provided that the *Tamiami—Orzel* factors are established. On the other hand, the court, although finding that the uniformed branch of the state police was such a field, felt obliged to analyze the particular present and likely future work assignment of the plaintiff to see if an age requirement was justified as applied to that assignment. This means that within any strenuous occupation where age is likely to be a BFOQ— pilot, firefighter, policeman, game warden—any administrative or supervising assignment would, if found by a court likely to endure, not be subject to the requirement. In a paramilitary organization where, as here, all members are subject to service in emergencies and to reassignment, this would mean either that superannuated poor-risk persons would be subjected to the most demanding tasks or that the force would be restricted in calling out and reassigning desk-bound personnel. Under the court's decision some members of the uniformed state police would not be available for general duties.

The district court was fully conscious of the problems posed by its fine-tuning approach. It noted that there is no correlation between rank and strenuous activity; officers in each rank may or may not be required to perform such activity. It recognized that "the possibility of inconsistent treatment of officers of the same rank may be expected to cause some difficulties", and that both officers approaching 50 and those in charge of duty assignments would have difficulty making assignment decisions. The court also acknowledged that the kind of particularistic case-by-case analysis it

had undertaken "might interfere with the smooth operation of the state pension system." We would add that this approach may also tempt some to seek a "safe harbor" assignment, penalize the dutiful, discourage promotion, encourage litigation, and necessitate judicial determinations that turn on quality judgments, such as how sedentary is the assignment, and probability judgments, such as how long is the assignment likely to last and how likely is emergency duty.

Does the ADEA, as the district court concluded, mandate this approach? We think not. The BFOQ statutory exception applies "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business". 29 U.S.C. § 623(f)(1). The word giving rise to the differing interpretation of the Seventh and Eighth Circuits is "occupational". In *E.E.O.C. v. City of Janesville,* 630 F.2d 1254, 1258 (7th Cir.1980), the court held that a chief of police, being within "the generic class of law enforcement personnel", was subject to the age retirement requirement; it deemed the term "particular business" to be the critical one, making irrelevant the fact that a particular occupation may be included within it. In *E.E.O.C. v. City of St. Paul,* 671 F.2d 1162, 1164–66 (8th Cir.1982), the court held that "occupations" within a "business" should be examined and that a fire chief, being completely able to fulfill his duties, was not subject to the age retirement requirement.[2] It was concerned with the hazard of applying a BFOQ to any generic class as determined by a state; it noted, "state law could create a class of 'all state employees' and thereby allow the state to retire a clerk because he or she is too old to fight fires." 671 F.2d at 1166 (footnote omitted).

We take a position between these two decisions. Unlike the Seventh Circuit, we think we can ascribe a meaning to "occupational qualification" that is separate from

---

**2.** A similar approach was followed in *E.E.O.C. v. City of Minneapolis,* 537 F.Supp. 750, 756 (D.Minn.1982).

"particular business".[3] We view "occupation" as a word of some breadth. Webster's applicable definition is: "The principal business of one's life: a craft, trade, profession or other means of earning a living ...." Webster's Third New International Dictionary 1560 (1966). For example, an airline is a "particular business", but within that business there are specific occupations with their own separate training, career progression, and age limitations, such as captain and first officer (retirement at age 60) and flight engineer (retirement at age 70). *See, e.g., Air Line Pilots Ass'n v. TWA,* 713 F.2d 940 (2d Cir.1983) *cert. granted,* —— U.S. ——, 104 S.Ct. 1412, 79 L.Ed.2d 739 (1984); *Criswell v. Western Airlines, Inc.,* 709 F.2d 544 (9th Cir.1983).

When, however, a person signs up in a paramilitary uniformed force, where one is subject to generally unrestricted reassignment and performance of the most strenuous duties in any emergency, and undergoes the military training required of all recruits, with the expectation of receiving special pension and disability benefits, we would be loath to equate particular "assignments", even if of long duration, to "occupations".

The Eighth Circuit case is susceptible of two interpretations. It dealt with the position of fire chief; arguably this position was sufficiently distinct to be considered an occupation separate from that of the rest of the department. But the court in *St. Paul* went on to say, "we cannot believe that the ADEA was intended to allow a city to retire a police dispatcher because that person is too old to serve on a SWAT team." 671 F.2d at 1166. If this nicety of distinction were to govern, we would have to say that an age limit geared to those performing at critical times the most strenuous function of a unit could not be applied to those performing somewhat less strenuous functions. If such were the law, state troopers engaged in tracking down and ap-

prehending car thieves and drug runners could be subjected to an age 50 retirement requirement, but those who merely had to chase speeders, to attend truck weighing stations, and to apprehend drivers under the influence of alcohol or without proper licenses would not be so subjected. This, we think, would atomize the general concept of "occupation".

Although we can understand why courts have interpreted the statute differently, we think that our interpretation is faithful to the words—that "occupational qualification" means more of a recognized and discrete vocation rather than a desk assignment for an employee subject to all the obligations and benefits of a quasi-military organization. We also feel, as indeed the district court conceded, that a contrary interpretation, which permits a particularistic analysis of the actual duties performed to overcome an otherwise justified BFOQ for similarly classified employees, would raise immeasurable problems of morale, administration, litigation, and adjudication. The question remains whether our preferred interpretation runs contrary to the discernible intent of the Congress.

The answer to this question is not advanced very far by recourse to the obvious policy of ADEA, "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). A more germane inquiry focuses on the Congressional intent behind the BFOQ exception. The parties in their briefs have seized upon the 1977 Senate debate considering the ADEA amendments raising the generally protected age from 65 to 70.

Preliminarily we remark that, between the enactment of ADEA in 1967 and these debates in 1977, we know of only four cases applying the BFOQ. In all of these, the focus was on the class of employees to which the BFOQ applied; there was no suggestion that there might be exceptions

---

**3.** Another reading of "occupational qualification that would give it separate meaning is "having to do with work", as opposed to a physical, sexual, racial, social, or educational qualification.

within the class. *Usery v. Tamiami Trail Tours,* 531 F.2d 224 (5th Cir.1976) (upholding company's refusal to hire those over 40 as inner city bus drivers); *Hodgson v. Greyhound Lines, Inc.,* 499 F.2d 859 (7th Cir.1974) (upholding company's policy of not accepting bus driver applications from persons over 35); *Aaron v. Davis,* 414 F.Supp. 453 (E.D.Ark.) (striking mandatory retirement at age 62 for assistant city fire chief and district chief), *motion for reconsideration denied,* 424 F.Supp. 1238 (E.D. Ark.1976); *McIlvanie v. Pennsylvania State Police,* 296 A.2d 630, 6 Pa.Comw. 505 (1972) (upholding the mandatory retirement of a state police officer at age 60 and rejecting notion that focus should be on the plaintiff's individual responsibilities as a troop commander, rather than on the responsibilities of the class as a whole). These cases of course do not imply that there cannot be fine tuning within a broad job classification; but they do show that the 1977 debate took place against the background of a broad brush application of the BFOQ defense by the courts.

Senator Williams, in commencing debate on the 1977 amendments, referred to his belief that there should not be a complete ban on mandatory retirement "where age has been established as a bona fide occupational qualification." 123 Cong.Rec. 34,296 (1977). In support of his position, the Senator continued:

"In his letter endorsing the basic purposes of my bill, President Carter expressed the same concern and asked that in enacting this legislation we clearly permit the establishment of a designated retirement age of less than 70 where age has been shown to be an important indicator of job performance. *For some types of work, for example, law enforcement activity, there may be a factual basis for believing that substantially all employees above a specified age will be unable to continue performing their duties.*" *Id.* (emphasis supplied).

After a lengthy debate on amendments which would allow mandatory retirement as early as age 65 for tenured college and public school teachers and certain top business executives, Senator Griffin questioned an example Senator Javits had given for a BFOQ, that for airline pilots, opining that "[T]here could be many airline pilots at age 70 who would be able and fit to fly their planes." 123 Cong.Rec. 34,318 (1977). There followed this strange statement by Senator Javits:

"The Senator caught me a little too fast. I did not mean to state that generically—that just because a person is an airline pilot he can be retired at age 60. All I meant to say was that the law permits that distinction to be made if the employer has a valid reason other than age. In other words, if the employer has factual proof of diminished capacity or an agency with regulatory authority finds that on the basis of skill and competence, quite apart from age, a person is unable to perform his duties as an airline pilot, the law permits that retirement. But the action must still be based on a factor other than age."

Plaintiff naturally stresses this language in support of his position. Of course it does support his position, in fact it goes far beyond. Indeed it is inconsistent with any concept of a BFOQ; the Senator's statement would limit retirement of airline pilots to those based on reasons "other than age". That this was an aberration became clear when, shortly thereafter, the Senator emphasized that "we intend that employers may establish a mandatory retirement age that is lower than age 70 ... where the employer can demonstrate that there is an objective, factual basis for believing that virtually all employees above a certain age are unable to safely perform the duties of their jobs". He then read from the committee report an example of a justifiable BFOQ:

"For example, in certain types of particularly arduous law enforcement activity, there may be a factual basis for believing that substantially all employees above a specified age would be unable to continue to perform safely and efficiently the duties of their particular jobs ...." 123 Cong.Rec. 34,319.

Senator Griffin, not quite satisfied, asked:

"I do not understand what the standard is supposed to be. Would he say, for example, that if most policemen are physically unqualified after age 65 to continue to serve on the police force, then all policemen could be required to retire at 65, rather than 70?" *Id.*

Senator Javits replied:

"If it is reasonable, factually based, and can be justified as a bona fide occupational qualification for that type of employment." *Id.*

We conclude from these extracts that the Congressional intent revealed by this debate is consistent with a properly justified across-the-board BFOQ for a class of employees such as the uniformed branch of state troopers in the instant case.[4]

We draw further support from *E.E.O.C. v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). In that case the Court considered whether a challenge by a Wyoming game warden to the state's mandatory retirement age of 55 was barred by the doctrine of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The Court looked at the nature of the burden on or interference with state policy constituted by the ADEA. It first noted that under the ADEA the state could still "assess the fitness of its game wardens and dismiss those wardens whom it reasonably finds to be unfit." 460 U.S. at ——, 103 S.Ct. at 1062. It contin-ued with language stressed by the district court: "Put another way, the Act requires the State to achieve its goals in a more individualized and careful manner than would otherwise be the case, but it does not require the State to abandon those goals, or to abandon the public policy decisions underlying them." *Id.*

Coming to the point, the Court concluded its comments on the ADEA by writing, "Perhaps more important, appellees remain free under the ADEA to continue to do *precisely what they are doing now*, if they can demonstrate that age is a 'bona fide occupational qualification' for the job of game warden." *Id.* (emphasis original).[5] Finally, and perhaps with most significance for this case, we note that the plaintiff in *E.E.O.C. v. Wyoming* was a game warden *supervisor.*

In passing, we take note of the fact that in 1974, when Congress extended ADEA coverage to state and local governments, it also established mandatory retirement ages for a number of federal public safety occupations. 5 U.S.C. § 8335.[6] We recognize that the Congress need not adhere to ADEA standards in setting mandatory retirement ages for federal personnel. *Orzel v. City of Wauwatosa Fire Department*, 697 F.2d 743, 749 (7th Cir.1983). *Cf. Johnson (E.E.O.C.) v. Mayor and City Council of Baltimore*, 731 F.2d 209 at 211–213 (4th Cir.1984) (court relied on Congress' establishment of mandatory retirement at age 55

---

**4.** We have also been cited to the following language in the Report of the House of Representatives Committee on Education and Labor on the 1978 amendments:

"It is recognized that certain mental and physical capacities may decline with age, and in some jobs with unusually high demands age may be considered a factor in hiring and retaining workers. For example, jobs such as those in air traffic control and in law enforcement and firefighting have very strict physical requirements on which the public safety depends. The Committee, however, expects that age will be a relevant criteria for only a limited number of jobs[.]" H.R.Rep. No. 95–527, 95th Cong., 1st Sess. 12 (1977).

To the extent that this extract illumines our quest, we would say that it "tilts" toward our interpretation. "Jobs" seems to be used to de-scribe very broad functional categories—traffic controllers, law enforcement and firefighting officials, all of which include administrative and other low pressure positions.

**5.** On remand, a jury upheld the 55 year mandatory retirement age as a BFOQ for Wyoming game wardens. *E.E.O.C. v. Wyoming*, No. C 80–0336 B (D.Wyo.1983), *cited in E.E.O.C. v. Mayor and City Council of Baltimore*, 731 F.2d 209 at 212 n. 7 (4th Cir.1984).

**6.** Those employees covered include agents of the FBI and the Secret Service, corrections officers, Immigration and Naturalization Service employees, U.S. Marshals, Bureau of Narcotics and Dangerous Drugs investigators, air traffic controllers, and federal firefighters.

for federal firefighters in upholding identical requirement for Baltimore firefighters). But we do think it pertinent to note that the federal legislation includes in its definitions of law enforcement officer and firefighter "an employee ... transferred to a supervisory or administrative position". 5 U.S.C. §§ 8331(20) and (21).

Finally, we acknowledge the possibility that a state could endeavor to sweep under one classification of employees many distinct vocations and occupations for which a low mandatory retirement age would be quite unjustified. We think that our own approach, recognizing the need to focus not only on the "particular business" but also on genuine and well recognized occupations within such businesses, would prevent or remedy indiscriminate lumping together. Beyond that, of course, courts would not be powerless to remedy blatant or covert efforts to subvert the ADEA.

*The judgment is reversed.*

