**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, Appellant,**

v.

**COMMONWEALTH OF MASSACHUSETTS, et al., Defendants, Appellees.**

No. 88–1226.

United States Court of Appeals, First Circuit.

Heard Sept. 13, 1988.

Decided Dec. 28, 1988.

Beatrice Valdez with whom Charles A. Shanor, Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, and Lorraine C. Davis, Asst. Gen. Counsel, were on brief for plaintiff, appellant.

Despena Fillios Billings, Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., was on brief for defendants, appellees.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The federal Equal Employment Opportunity Commission (EEOC), acting on behalf of thirty-five named individuals, brought suit against Massachusetts under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq* (1982). The EEOC claimed that since 1981 the Massachusetts Registry of Motor Vehicles had discriminated against older people by refusing to let anyone over the age of 35 take a qualifying examination for the position of "examiner." Mass.Gen.L. ch. 90, § 29 (1984). The Commonwealth asked for partial summary judgment on the basis of a 1986 amendment to the federal statute, that specifically provides that

> [i]t shall not be unlawful for an employer which is a State ... [or] an agency or instrumentality of a State ... to fail or refuse to hire ... any individual because of age if such action is taken ... with respect to ... employment ... as a law enforcement officer.

29 U.S.C. § 623(i) (Supp. IV 1986). After discovery, the district court decided, on the basis of the record, that "examiners" were indeed "law enforcement officers" and that no reasonable trier of fact could find to the contrary. The court then granted summary judgment for Massachusetts and dismissed the complaint. The EEOC appeals. After reviewing the record, we conclude that the court's basic findings were legally proper; Registry examiners are indeed "law enforcement officers" for purposes of the 1986 statute. We must remand, however, for further proceedings with respect to the period between 1981 and 1986, be-

fore the amendment to the statute took effect.

■ 1. The EEOC first argues that the district court decided the motion for summary judgment without giving it proper opportunity to conduct discovery. It points to Federal Rule of Civil Procedure 56(f), which says that, if it should appear

from the affidavits of a party opposing [a summary judgment motion, e.g., the EEOC] ... that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). The EEOC adds that, at the very least, it made apparent to the court that it needed more time and more discovery. *Cf. Littlejohn v. Shell Oil Company,* 483 F.2d 1140, 1145–46 (5th Cir. 1973) (plaintiff who failed to submit proper Rule 56(f) affidavit was nonetheless entitled to more discovery where plaintiff's lawyer made written representation, where discovery had been inadvertently shut off, and where "not a single document had been produced"), *cert. denied,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973).

The problem with the EEOC's argument is that the record reveals the contrary. It indicates that the EEOC did not suggest a need for additional discovery, but rather, led the district court to believe that it had obtained all the discovery material that it needed.

Our examination of the record shows the following:

a. *January 7, 1986.* The Commission filed its complaint.

b. *March 3, 1986.* The Commission filed interrogatories and requests for documents.

c. *June 16, 1986.* The Commonwealth provided, *inter alia,* job descriptions and personnel announcements.

d. *December 8, 1986.* The court stayed discovery pending its decision on a partial summary judgment motion, which it asked the Commonwealth to file.

e. *March 13, 1987.* The Commonwealth filed its partial summary judgement motion along with an affidavit given by John A. Nason, Jr., the Deputy Registrar of Motor Vehicles for Law Enforcement.

f. *March 27, 1987. The EEOC asked the court for permission to take depositions.*

g. *April 3, 1987. The court denied the EEOC's request for depositions.*

h. *April 16, 1987.* The EEOC told the court that "before a partial summary judgment can be granted ... additional discovery must be permitted." And, the EEOC cited Federal Rule of Civil Procedure 56(f).

i. *June 1, 1987.* The district court, stating that it needed more factual information, *denied the Commonwealth's motion for partial summary judgment.*

j. *June 10, 1987. The EEOC wrote to the district court stating that it* renews its request for *limited* discovery. The EEOC submits that the information directed by the Court to be contained in "further affidavits or other papers" is best obtained by a deposition of Mr. Nason or some other knowledgeable official designated by defendants. A deposition should resolve the ambiguities engendered by the initial affidavits. This discovery can be carried out within the same time frame set forth by the Court for additional affidavits, and should be dispositive of the instant motion [for partial summary judgment] without undue delay.

k. *June 23, 1987.* The district court *granted* the EEOC's June 10 discovery request.

l. *July 14, 1987.* Deposition taken of John A. Nason, Jr.

This chronology reveals that the EEOC did indeed ask the district court for additional discovery in March and April 1987 (items "f", "g" and "h" above). *But, subsequently,* EEOC made clear to the court that it wished only *limited* additional discovery; and *the court granted that subse-*

*quent request* (items "j" and "k" above). We have found nothing in the record to indicate that the EEOC made any request for further discovery after June 23, 1987. The EEOC says that the Commonwealth failed to make available certain documents that it learned about during Nason's July 14 deposition; but, nothing in the record suggests that the EEOC pursued that matter before the court. (Indeed, the Commonwealth asked the court for a protective order making clear it did not have to produce the documents; the EEOC did not file an opposition to this request.) The best the EEOC can do is to claim that it asked the court about the documents, orally *and off the record.* We do not take account of "off the record" matters for obvious reasons, including the reason, highly relevant here, that we cannot be certain what counsel actually said or in what context.

In sum, the court acted properly and correctly in considering relevant discovery (with respect to the partial summary judgment motion) as complete and in deciding the motion on the basis of the record before it.

■ 2. The EEOC next claims that the district court should not have granted summary judgment on the "law enforcement officer" issue. The 1986 amendments to the federal statute define a "law enforcement officer" as an employee

the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of a State, including an employee engaged in this activity who is transferred to a supervisory or administrative position.

29 U.S.C. § 630 (Supp. IV 1986). In the EEOC's view whether or not the Registry's "examiner" position satisfies this definition at least raises a "genuine" and "material" issue of fact. Fed.R.Civ.P. 56(c). But on the basis of the record, we cannot agree.

The Commonwealth presented evidence that we can summarize as follows:

1. *Statutes.* Massachusetts General Laws specifically grant "examiners" all the powers granted police officers,

Mass.Gen.L. ch. 90, § 29 (1984), including the power to carry deadly weapons, and they require examiners to have studied at a certified "police training school," Mass.Gen.L. ch. 41, § 96B (1984).

2. *First Nason Affidavit.* The Deputy Registrar of Motor Vehicles said: *that* "examiner" is the entry level rank for the Registry's police force; *that* examiner candidates successful on the civil service exam must then complete an intensive fourteen week police officer training course followed by a one week "motor vehicle exam" course; *that* successful candidates may bid for assignment to any of 35 Registry offices or to special law enforcement units, such as "Auto Theft," "Drunk Driving Roadblock," "Investigative," and "Warrants Apprehension" units; *that* at all times examiners must carry firearms; *and that* examiners not only examine driving license applicants, but also make inspections, collect suspended licenses, investigate those seeking license reinstatements, and may be asked at any time to perform police duties. The Deputy Registrar added: *that* the Massachusetts Civil Service Commission has held that the examiner position is essentially the same as that of a municipal police officer for "transfer" purposes; *that* a federal court consent decree permitted examiner civil service lists to be used for purposes of making minority "affirmative action" appointments to entry level police officer positions; *that* collective bargaining agreements provide certain typical "police officer" type benefits for examiners, such as paid court time, paid police detail rates, and pay incentives for obtaining further "law enforcement" degrees; *and that* photographs (included) showed examiners wearing police-type uniforms with patches that say "Massachusetts Registry Motor Vehicles Police."

3. *Second Nason Affidavit.* The Deputy Registrar added the following: a) As of August 6, 1987, there were 138

examiners, 117 in branch offices and 21 in special units; b) Examiners make arrests. Between January 1, 1987 and August 6, 1987, Registry officers made 732 arrests; examiners attached to Registry branch offices made 254 of these arrests and examiners attached to special law enforcement units made 89; c) Examiners participate in routine traffic patrols in the Registry's approximately one hundred (100) marked cruisers, during which they apprehend drunk drivers, persons driving without a valid license, and others who violate motor vehicle laws; d) Each examiner has a motor vehicle citation book. Examiners who issue citations will likely prosecute their own cases or assist a member of the district attorneys office in doing so. "[V]irtually all Examiners, regardless of their location or assignment, have participated in such prosecutions." e) Examiners "routinely" investigate accidents; they patrol roads, organize traffic patterns, and help during emergencies. They perform police duties at road construction sites, rock concerts, and parades. They provide armed escorts for transport of large sums of money. They are "often" reassigned to perform street or cruiser police duty with little notice. Nason added that in March 1985 the Massachusetts legislature created a new non-law enforcement position called "clerk examiner" in order "to free up Examiners and other Registry police officers to perform exclusively law enforcement functions." The legislature first established fifteen such positions, and later added an additional thirty.

4. *Johnson Affidavit.* Donald Johnson described his duties as an examiner with the Registry's Worcester Branch office as devoted almost exclusively to "law enforcement." Between 1975 and 1981 he investigated about 450 fatal accidents, he patrolled roadways, he enforced traffic laws, he made between one and two arrests per week, and he "regularly" prosecuted his own cases in court. He worked regularly with local police officers. He devoted one day every two weeks to conducting drivers' license examinations. He said that Registry officers are reassigned with little warning and "must be prepared to assume law enforcement functions at any time."

The only conflicting evidence that EEOC produced consisted of an affidavit by an EEOC trial attorney, Christopher P. Lee, stating that a former Assistant Registrar, Anthony Trocki (now on extended leave) told him by phone that:

a) at one time any person aged 21 to 55 could take the examiners test and become an examiner without formal training;

b) he was not aware of an examiner ever having discharged a firearm and he believes the union bargained for the right to carry firearms to increase benefits; and

c) an examiner may spend his entire career in a non-law enforcement position, such as exist in the Equipment Section, where examiners check "brake and light" stations and inspect school buses.

In our view, as in that of the district court, this evidence requires a finding that the Registry "examiner" is a "law enforcement officer" within the terms of the 1986 amendment to the federal statute. The long list of law enforcement duties, the description of the manner in which those duties are undertaken, the numerical indications that time spent on law enforcement duties is quantitatively significant (*e.g.,* the arrest numbers), the type of training required, the interchangeability of duties, the legislative indication that the "non-law enforcement" duties are not primary (*e.g.,* providing for 45 "clerk examiners" apparently to take over those duties from 117 branch "examiners"), all raise a strong presumption that the examiners engage primarily in law enforcement work.

The EEOC's counter-affidavit is insufficient, as a matter of law, to rebut this presumption. Leaving aside any weaknesses relating to the source of the information it contains, it still says only that "at one time" training was considerably less for-

mal, that Mr. Trocki does not personally know of an instance when a firearm was discharged, and that *some* examiners do not engage in law enforcement activities. No fact finder could believe that, with respect to training, he is speaking of the present; nor could it consider the "discharge" of a weapon to be determinative; nor could it draw from the statement that *some* examiners do not engage in law enforcement the conclusion that a significant number do not do so, particularly because Mr. Trocki's example is *not* that of a "license examiner" and because he does not dispute the apparently common transfer of duties among examiners. *Cf. Mahoney v. Trabucco,* 738 F.2d 35 (1st Cir.1984) (holding that if age discrimination is a bona fide occupational qualification (BFOQ) for one member of para-military force, in which members frequently shift duties, it is a BFOQ with respect to all members of the force), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984).

The EEOC (and the dissent here) also point to Nason's statement that the Department asked for 120 clerk examiners "to free[ ] up," to "release all of our law enforcement people to go back onto the street," and to "replace all the law enforcement people." They believe this statement may be read as indicating that the Department wanted 120 non-law enforcement clerks to take over the non-law enforcement duties of the 117 present law enforcement examiners in the branch offices. However, we cannot accept such a reading because (1) in light of Nason's other statements, he could not have meant (as their reading means) that *all* duties of the present examiners are non-law enforcement and (2) Nason also testified that "there are approximately the *same number*" of investigators as there are law enforcement examiners and that law enforcement examiners and investigators *"perform the same duties."* JA at 356, 349 (emphasis added). We can read Nason's words, in context, only as meaning what they say, that 120 non-law enforcement clerks are needed to take over the non-law enforcement duties of *"all"* of the Department's 306 "law enforcement" employees. Given the long list of law enforcement

duties Nason listed, we do not see how one can reasonably take his words to say otherwise.

In sum, in our view, the district court properly granted summary judgment under the 1986 statute.

■ 3. The EEOC claims that the district court erred in granting summary judgment with respect to the period before the 1986 statute became law, *i.e.,* the period from 1981 through 1986. It points to language in the 1986 statute, which says that it does not apply "with respect to any cause of action under the Age Discrimination ... Act ... as in effect before January 1, 1987." Pub.L. No. 99–592, § 7(b), 100 Stat. 3342, 3345 (1986). It adds that the legal issue, with respect to discrimination that took place in that period, is a different one, for the Commonwealth would have to show, even with respect to "law enforcement officers," that its age criterion "is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." 29 U.S.C. § 623(f)(1) (1982). And, it argues that (1) the Commonwealth did not ask for summary judgment with respect to 1981–86 discrimination; it filed only a motion for *partial* summary judgment with respect to the applicability of the 1986 statute to examiners; (2) the EEOC did not have a chance to present evidence or to argue the law or facts with respect to the 1981–1986 period; (3) the district court wrote only that the evidence *"may have"* satisfied the criteria for "an aged-based BFOQ" under this circuit's case of *Mahoney v. Trabucco, supra;* and (4) *Mahoney* does not control this case, for it involved an age-of-fifty *retirement* rule held a lawful BFOQ *after a trial* where the factfinder determined that substantially all fifty year olds could not safely perform the duties of a state police officer and that it would be impracticable or impossible for the Commonwealth to proceed on a case-by-case basis. *See Mahoney,* 738 F.2d at 37.

The Commonwealth conceded most of these points. But it argues that remand is pointless, for the trial court cannot grant meaningful relief. Changes in the law make it impossible for the court to order the Commonwealth to hire individuals on

the EEOC's list as "examiners" today; and, the court could not determine damages, for there is no way to know, even if these individuals were legally entitled to take the qualifying examination between 1981 and 1986, whether they would have passed the examination and been hired. The EEOC does not agree.

We are not certain, given our holding, and the legislative change in circumstances, that the EEOC will wish to proceed with the remainder of this case. Nonetheless, if it decides to do so, it is more appropriate, and likely more efficient, for the parties to make these arguments in the trial court than to make them, for the first time, here, where there is no factual basis for assessing defendants' claim that relief is too speculative to justify further proceedings. *Cf. Ramsey v. United Mine Workers of America*, 401 U.S. 302, 311–12, 91 S.Ct. 658, 664–65, 28 L.Ed.2d 64 (1971). As all parties concede, they have not specifically addressed the 1981–1986 discrimination issue in the trial court. *See Celotex Corporation v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986) (*sua sponte* summary judgment by district court is proper only where the losing party was on notice that it had to come forward with all of its evidence). We therefore remand this case to the trial court.

*Affirmed in part; vacated in part; and remanded.*

COFFIN, Circuit Judge (dissenting). I register this dissent in an effort to prevent, in other cases if not this one, a slippage from the vigorous constraints of summary judgment review. The majority, I fear, has not heeded the stern command to indulge all reasonable inferences from facts in favor of the party opposing summary judgment.

In this case a summary judgment has an unusual hurdle to clear, in that the Commonwealth has to establish that the facts permit no reasonable person to conclude that the registry examiners are *not primarily engaged in investigating, apprehending, or detaining criminal suspects.* These very specific requirements in both nature and degree of "law enforcement" activity set this case apart from a case such as *Mahoney v. Trabucco*, 738 F.2d 35 (1st Cir.1984), where all personnel in a paramilitary organization are treated as fungible insofar as the application of the bona fide occupational qualification exception to the ADEA is concerned.[1]

The court's opinion does an excellent job of showing that examiners in some degree do many things that police do, but which do not involve the investigation, apprehension, or detention of criminal suspects. These include such duties as attending police training school, carrying firearms, investigating accidents, helping out in emergencies and large gatherings, and providing escort to custodians of large amounts of money. As for investigating, apprehending, and detaining criminal suspects, the record is both meager and ambiguous. The fact that a successful candidate for an examiner's position may bid for assignment to special units such as "Auto Theft," "Drunk Driving Roadblocks," "Investigative," and "Warrants Apprehension" suggests that the work done by the bulk of examiners in branch offices does not primarily involve the prerequisite duties.

The apprehension of violators of motor vehicles laws does appear to fall within the "law enforcement" definition, but there is no indication of the primacy of this function; to the contrary, the one statistic available tells us that over a seven-month period the 117 examiners in branch offices made 254 arrests—or an average of 2.2 arrests a month for each examiner. Certainly this fact does not bar a conclusion that apprehending suspects was not a primary activity.

---

**1.** At first blush, it may seem a plain reading of the ADEA's definition of "law enforcement officer" would reintroduce the issue facing us in *Mahoney*, whether to treat police officers in administrative posts differently from those in the field. But the statute answers this concern. The definition of "law enforcement officer" under the 1986 amendment includes "an employee engaged in [the investigation, apprehension, or detention of individuals suspected or convicted of criminal offenses] who is transferred to a supervisory or administrative position." 29 U.S. C.A. § 630(k) (Supp.1988).

So also as to the fact that the Deputy Registrar of Motor Vehicles averred that 120 new (nonenforcement) clerk examiners were needed to release "all of our law enforcement people to go back out on the street." One can of course argue that "all" refers to the 306 employees that the Deputy Registrar characterized as being in law enforcement. This would indicate that roughly a third of the duties of present personnel are administrative and presumably two-thirds are "law enforcement." But it is equally reasonable, in context, to draw an opposite conclusion. One of the Deputy Registrar's statements was "As we put clerk examiners into the branch offices ..., we are freeing up the law enforcement people to go back out on the highway." One may infer from this that the people freed-up are to be the 117 examiners in the branch offices. On this reasoning, one can conclude that if it takes 120 civilian clerk examiners to free up 117 branch examiners (and perhaps some investigators), branch examiners currently are doing very little law enforcement work.

I therefore think that a genuine issue of material fact exists and that summary judgment was improper.