**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**v.**

**STATE OF TENNESSEE WILDLIFE RESOURCES AGENCY.**

**No. 81–3461.**

United States District Court,
M.D. Tennessee,
Nashville Division.

March 7, 1986.

Joseph Ray Terry, Regional Atty., R. Larry Brown, Supv. Trial Atty., Harriett Miller Halon, Trial Atty., E.E.O.C., Memphis, Tenn., Calvin C. Williams, Jr., R. Faye Austin, Sr. Trial Attys., Gail Black, Associate Gen. Counsel, E.E.O.C., Washington, D.C., for plaintiff.

Mary E. Walker, Christine A. Modist, Asst. Atty. Gen., Nashville, Tenn., for defendant.

## MEMORANDUM

HIGGINS, District Judge.

The Equal Employment Opportunity Commission (EEOC) brought this action in July, 1981, challenging the statutory mandatory retirement age of 55 for Tennessee Wildlife Enforcement Officers. In December, 1982, the case was administratively closed pending the decision of the United States Supreme Court in *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). Following the Court's decision in *Wyoming,* the EEOC moved to reinstate the case to the active trial docket. The motion was granted on March 30, 1983. This action came to be tried before this Court on July 22, 1985, and the trial as to the issues of liability and general injunctive relief was conducted on July 22 through July 27, 1985. Pursuant to the Court's order of June 17, 1985, the trial was bifurcated and the issues of individual relief remain to be tried. Prior to the trial, the EEOC withdrew its claim for liquidated damages under 29 U.S.C. § 623.

For the reasons stated below, the Court finds that mandatory retirement at age 55 is a bona fide occupational qualification (BFOQ) for wildlife officer I, wildlife officer II and area supervisor, but that 55 is not a BFOQ for the positions of chief of law enforcement or assistant chief of law enforcement.

*Findings of Fact*

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§ 216(c), 217 and 626(b). The EEOC, an agency of the United States government expressly charged with the administration, interpretation, and enforcement of the Age Discrimination in Employment Act (ADEA), is authorized to bring this action under 29 U.S.C. § 626(b).

The defendant is the State of Tennessee, Tennessee Wildlife Resources Agency (TWRA), which was created by the Tennessee State Legislature under the authority of Tenn.Code Ann. § 70-1-301 and which is an employer under the ADEA, 29 U.S.C. § 630(b). TWRA, pursuant to Tenn.Code Ann. § 70-1-302, is responsible for enforcing all hunting, fishing and other laws relating to the management, protection, propagation and conservation of wildlife. TWRA also has responsibility for enforcing and administering the Tennessee Boating Safety Act, Tenn.Code Ann. § 69-10-201, *et seq.* Testimony showed that the presence of the wildlife officer in the field is critical to the preservation and propagation of wildlife and officers are crucial in protecting the safety of the public, both on the waters and in the field.

The Tennessee Wildlife Resources Commission, a body of ten citizens appointed by the Governor of the State of Tennessee, is charged with appointing the executive director of the TWRA and setting his or her salary, as well as approving the agency's budget. The Commission also promulgates rules and regulations governing hunting and fishing seasons.

Wildlife officers in all four of the classifications—wildlife officer I (entry class), wildlife officer II (assistant supervisor), wildlife officer supervisor, and wildlife enforcement coordinator (chief of law enforcement) [1]—are responsible for the enforcement of boating, hunting, fishing, littering and pollution laws. Examples of the duties of wildlife officers are checking hunting and fishing licenses; inspecting vehicles for possession of illegal game; checking bag and creel limits; monitoring waters for speeders and intoxicated boaters; investigating reports of deer spotlighting, illegal fishing sites, and night hunting sites; and apprehending and arresting violators of fish, game and boating laws. Wildlife officers are on call 24 hours a day and are often called out at night to perform their duties. During peak seasons, such as the deer and duck seasons, officers may work long hours in adverse weather conditions. Wildlife officers in all classifications generally work without close supervision and frequently set their own schedules and work assignments.

The wildlife officers I are the primary enforcement officers in the field. Wildlife officers II perform the duties of wildlife officers I and, in addition, have responsibility for leading law enforcement patrols, making job assignments, and reviewing the reports of wildlife officers I. The wildlife officer supervisor participates in field duties with the officers I and II under his supervision approximately three days a week. His other duties include supervisory and administrative work. The wildlife enforcement coordinator or chief of law enforcement performs administrative tasks and acts as an advisor to the executive director of TWRA. He participates in enforcement activities in the field approximately ten days a year. The duties of a wildlife officer become less strenuous and more administrative as he or she progresses up the chain of command.

The EEOC has challenged the mandatory retirement statute, Tenn.Code Ann. § 8-36-205(2), which applies to wildlife officers employed by the TWRA, as being in violation of the ADEA. The ADEA prohibits discrimination in the employment of persons between 40 and 70 years of age. 29 U.S.C. §§ 623 and 631(a). Tenn.Code Ann. § 8-36-205(2) provides that

> any member in service as a wildlife officer shall be retired upon the last day of the fiscal year during which he has attained age fifty-five (55) and has completed twenty-five (25) years of creditable

---

1. When the Court refers to wildlife officers, it is referring to officers who hold one of the four positions mentioned above, except where otherwise noted.

service; provided, however, any such member who has not attained age sixty (60) may continue doing service to age sixty (60) upon application to and approval by the Wildlife Resources Commission. Tenn.Code Ann. § 8–34–149 defines a wildlife officer as "any commissioned employee of the wildlife resources agency engaged in law enforcement activities on a day-to-day basis". TWRA has asserted as an affirmative defense that the mandatory retirement age of 55 for wildlife officers I and II, wildlife officer supervisor, and wildlife enforcement coordinator is lawful as a "bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of the particular business." 29 U.S.C. § 623(f)(1).

TWRA employs 461 persons of which only 156 are wildlife officers subject to mandatory retirement at age 55. According to the testimony of Steve Adams, Director of the Tennessee Consolidated Retirement System (TCRS), James Dillard, Personnel Director of TWRA, and Gary Myers, Executive Director of TWRA, the only positions which are subject to mandatory retirement at age 55 under Tenn.Code Ann. § 8–36–205(2) are wildlife officer I, wildlife officer II, wildlife officer supervisor and wildlife enforcement coordinator.[2] Those employees who are not required to retire at age 55 include employees such as clerical workers who do no law enforcement work, as well as biologists and area managers who do limited law enforcement work.

The statute, Tenn.Code Ann. § 8–36–205(2), allows a wildlife officer to seek an extension from the Wildlife Resources Commission at age 55, if he is required to retire. Prior to 1979 no extensions were granted. Since 1979, the Commission has granted one-year extensions to seven different officers and some officers

have received more than one extension. The latest extensions were granted on July 1, 1985. Testimony showed that the Commission, in granting the extensions, did not make individual determinations as to job performance, physical ability, or physical fitness, but rather based its decision on political factors and on the economic plight of the officers.[3]

The retirement statute also does not absolutely mandate an officer's retirement at age 55. To be eligible for full benefits at age 55 the officer must have 25 years of service. Thus, an officer hired after age 30 can work beyond age 55 without seeking an extension.[4]

There is also some question as to the retirement status of officers hired after July 1, 1976. On that date, state employees were put under a group uniform retirement system. Wildlife officers, hired after July 1, 1976, would appear to fall within group I, which has a mandatory retirement age of 60. Nevertheless, Steve Adams, Director of TCRS, testified that since the specific statute mandating retirement of wildlife officers at age 55 was not changed when the group uniform retirement system was put into effect, the TCRS has always considered the specific statute as controlling. Thus, both TCRS and TWRA maintain that wildlife officers must retire at age 55 if they have 25 years of service.

Prior to the passage of the mandatory retirement statute, there was no mandatory retirement age and some officers who were in declining health were not able to retire because of inadequate benefits. In 1967 and 1968 officials with the Tennessee Game and Fish Commission, the predecessor of TWRA, were concerned with the ability of persons over age 55 to perform effectively the job of wildlife officer. George Tucker Brown, a former Chief of

---

**2.** At one time TWRA also employed an assistant chief of law enforcement. George Tucker Brown was the last wildlife officer to hold this job.

**3.** In fact, the single most influential reason in the granting of extensions seems to be the political pressure that is put on the Commissioners to vote for an extension. In one case, according to

the testimony of a commissioner, the Governor's better schools program was held "hostage" pending the Commission's vote on an extension.

**4.** Both Dillard and Myers testified that officers were rarely hired beyond age 30. Whether age 30 would be a BFOQ for the hiring of officers is not an issue before this Court.

Law Enforcement and a retired Assistant Chief of Enforcement, testified concerning his observation at the time of the passage of the statute that officers over age 55 were more likely to become ill. Brown attributed this to the long hours and strenuous working conditions. Ray Henry, a retired wildlife officer, also testified that prior to the time of the passage of the mandatory retirement statute informal staff meetings to discuss the problem of the inability of older persons to perform satisfactorily as wildlife officers were held. The consensus, according to Henry, was that after age 50 wildlife officers were unable to function satisfactorily, but agency officials felt that the legislature was unlikely to pass a bill with a mandatory retirement age of less than 55 and hence recommended 55 as the mandatory retirement age. Henry, who was a very credible witness, was firm in his conviction that older officers were unable to meet the physical demands of the job of wildlife officer and gave specific examples from his own experiences in which older officers tired quickly when wading through water and pulling boats. Henry did not seek an extension when he reached retirement age because he felt he could no longer do the job safely and efficiently.

The legislative history of Senate Bill 1355, Ch. 514, of Public Acts 1968, which contains the mandatory retirement section, discloses that the legislature was concerned with the vigorous nature of the job, as well as the long hours worked by the officers, when it passed the mandatory retirement statute.

According to the testimony of Dillard, Myers, and Adams, after the ADEA was made applicable to the states, TWRA consulted with its attorneys, its wildlife law enforcement officers, the Officers' Protective Association, the Tennessee Department of Personnel, the Tennessee Consolidated Retirement System and medical experts to determine if retirement at age 55 is a BFOQ for wildlife officers. ·The Court notes, however, that these studies were of the nature of attempts to defend age 55 as a BFOQ rather than attempts to determine what age, if any, constitutes a BFOQ for the retirement of wildlife officers. Both George Tucker Brown and Ken Stockdale, former Chiefs of Law Enforcement, supported age 55 as an appropriate retirement age. Defendant's Exhibit 10, which is a memo from Stockdale to Myers, dated October 1980, sets out the factual basis on which Myers and Stockdale believed that a wildlife officer could no longer do his job efficiently at age 55. Myers also testified that he based his opinion that age 55 is an appropriate retirement age on the review of statistical reports such as prosecution reports, the semi-monthly activity summaries, and supervisory reports from the area supervisors. He also considered the performance of individual officers, and consulted with the medical experts, who testified for the State at the trial of this case.

The vigorous physical nature of the job of wildlife officer, other than that of the chief of law enforcement, is relatively undisputed. The EEOC, however, would dispute the frequency of performance of the most arduous of the officers' tasks such as lifting and carrying animals and equipment, handling 100 pound fish baskets and fish nets, building fish attractors, chasing violators, participating in overnight stakeouts in extremely cold or hot weather, lifting and pulling boats, and tracking violators over extended periods of time through undergrowth, over uneven ground, and in water and mud. The EEOC presented testimony that many tasks either occurred infrequently or could be done at the officer's own pace. Likewise, the fact that officers are confronted with life threatening or stressful situations is not disputed by the EEOC, which again contends that such situations occur infrequently. Most "arrests" of violators result in the issuance of citations rather than the custodial arrest of violators. Testimony of several officers, past and present, support the conclusion that wildlife officers in the field are faced with vigorous physical work over long hours and are sometimes in stressful situations where they fear for their safety as well as that of the public. Examples of boating incidents and illegal hunting activi-

ties showed that the officers are called upon to act quickly under stress.

The officers also work long hours. Wildlife officers are on call 24 hours a day, and, since there is generally only one officer per county, he or she is responsible for responding to any call, day or night, in that county. Testimony indicated that officers are often called out at night to check such violations as deer spotlighting or illegal raccoon hunting. A wildlife officer can accumulate 450 hours of compensatory time, but hours above that number are cancelled. Dillard testified that the equivalent of five extra men in the field had been provided in 1984 by cancelled compensatory hours.

Officers also work in adverse weather. During water fowl season, officers work long hours in extremely cold weather. Enforcement of boating safety laws occurs in extremely hot and humid conditions.

Prosecution reports for 1984, Defendant's Exhibit # 6, indicated that the number of arrests made by officers decreases after age 45. TWRA contends that although the efficiency of an officer should not be evaluated solely on the number of arrests made in a year, the number is an indicator of the officer's efficiency. The number of arrests made is dependent, as Myers admits, upon factors such as game population and water sources over which the officers have no control. Also, the maturity of the officer and the officer's individual methods of approaching a situation may affect the number of arrests. The Court finds that the prosecution reports of arrests made are not by themselves an accurate indicator of the efficiency of older officers, but do, together with other testimony, confirm the tendency of older officers to slow down in their enforcement activities.

Wildlife officers are also on call under the Tennessee Emergency Management Plan. Under that plan the officers have protected the public safety during the truckdrivers' strike, the Memphis firefight-ers' strike, the Waverly train disaster, and prison riots and escapes. Wildlife officers also assist and cooperate with other law enforcement agencies in search and rescue missions, and drug enforcement efforts.

The chief of law enforcement has a job that is primarily administrative. The office of chief, according to the testimony of Ken Stockdale, a retired Chief, is not in the line of authority in law enforcement in the agency but rather is an advisory position to the director and staff in Nashville. The Chief also works with the regional managers on their law enforcement problems. As Chief, Stockdale did administrative jobs such as purchasing uniforms and supervising the hunter and boater safety sections, the communications section and the film library. He was OSHA coordinator, and he made suggestions concerning enforcement and advised the director of TWRA. He was not in the direct chain of command for law enforcement. The persons who report directly to the chief are not law enforcement personnel. The chief does perform some law enforcement during peak periods and is in the field approximately ten days a year.

Regional managers are responsible for directing all activities, including law enforcement activities in the four regions of the State. The regional managers, who are usually fish or game biologists [5] and who are not subject to mandatory retirement, report directly to the assistant director of TWRA and thus bypass the chief. The chief can suggest to the regional managers, but not direct that law enforcement be conducted in a particular fashion.

George Tucker Brown held the position of assistant chief enforcement at his retirement. According to his testimony, his position was purely administrative and did not encompass law enforcement. The agency asserts that Brown could have been transferred into law enforcement activities at any time, but does not dispute that at retirement he was not engaged in law enforcement. Besides administrative duties,

5. Stockdale did testify that one of the four persons who currently serve as regional managers came up through the law enforcement ranks.

he was in charge of equipment and building security. TWRA does not specifically assert the BFOQ defense for this position, which evidently no longer exists.

Both sides presented extensive expert testimony as to the level of physical fitness required to perform the job of wildlife officer and the ability to test for this level of fitness. There is no dispute that the jobs of wildlife officer I, wildlife officer II and wildlife supervisor encompass strenuous physical activities on a routine basis. Nor is there a dispute that physiological functions decline with advancing age. The question is centered on whether, at this time, age alone is the only reliable predictor of incapacity to perform the duties of the wildlife officers.

The medical testimony presented by TWRA focused primarily on two issues: first, the level of aerobic fitness necessary to perform as a wildlife officer and second, the degree of coronary artery disease present in men over age 55. The EEOC countered with testimony as to the ability to test individuals for aerobic capacity and coronary artery disease.

Dr. Alexander Lind, who qualified as an expert in physiology for the defendant, testified as to the effects of aging on aerobic capacity, isometric strength, and heat adaptation. Dr. Lind testified that flexibility and agility declines by approximately 40 percent between the ages of 20 and 60 and that muscular strength also decreases with age as exhibited by a decrease in handgrip strength of approximately 10 to 15 percent between the ages of 20 and 60. The most important focus of Dr. Lind's opinion, however, was on aerobic capacity.

Muscles function by using anaerobic power and aerobic power. Aerobic power is the source of muscular activity for most everyday activities and calls for an increase in the amounts of oxygen and foodstuffs supplied to the muscles in direct relationship to the severity of the work done. There is a finite limit to the amount of oxygen an individual can supply to the muscles. The volume of oxygen produced at maximum work capacity is termed $VO_2$ max (maximum volume of oxygen). *See*

Defendant's Exhibit 23, diagram b. In the absence of sufficient oxygen, muscles can break down glycogen, which allows muscles to continue to contract. This is anaerobic power. Anaerobic power is used in reaching $VO_2$ max and can allow work to continue after $VO_2$ max has been reached, but only for a short period of time. *See* Defendant's Exhibit 23, diagram c. During exhausting exercise at ten seconds 85 percent of the work is anaerobic while 15 percent is aerobic, but after two minutes 50 percent of the work is anaerobic and 50 percent is aerobic, and after 60 minutes only 2 percent of the work is anaerobic, while 98 percent is aerobic. Thus, aerobic capacity is an important factor in the ability to perform sustained strenuous work.

Both parties agree that there is a linear decline in aerobic capacity with advancing age. While experts agree that factors other than age affect the rate of decline, they differ somewhat on the rate of decline. Dr. Lind testified that aerobic capacity declines about 10 percent per decade. The plaintiff's expert, Dr. Paul Davis, agreed that there was approximately a 9 percent decline in $VO_2$ max per decade.

Dr. Lind testified that the vigorous job of the wildlife officer would require a $VO_2$ max of 3.0 liters of oxygen per minute [or 42.9 milliliters of oxygen per kilogram per minute for a "standard" man of 70 kilograms (154 lbs.) body weight] to safely and efficiently perform the job. Dr. Lind chose 3.0 liters of oxygen per minute as a $VO_2$ max necessary for the job of wildlife officer because he felt that in a situation requiring force an officer without this capacity would not be able to perform successfully. Thus, Dr. Lind's opinion that a capacity of 3.0 liters of oxygen per minute is necessary for the job of wildlife officer is based on the theory that the maximum effort to do the most crucial job becomes the minimum requirement. Even routine duties, such as walking through rough terrain or in mud, can require 2.5 liters of oxygen per minute and over extended periods of time can require 3.0 liters of oxygen per minute. In Dr. Lind's opinion, an officer, who has been expending in excess of 2.0 liters of

oxygen per minute in routine work and who is suddenly confronted with an emergency, will not be able to perform adequately if his capacity is below 3.0 liters of oxygen per minute. According to Dr. Lind, only 2.5 percent of men over age 55 would have the required capacity of 3.0 liters of oxygen per minute.

Engaging in regular physical exercise can improve $VO_2$ max. Exercising 20 to 30 minutes three times per week at 60 percent of aerobic capacity can improve $VO_2$ max in sedentary persons by 10 to 20 percent, but those who exercise regularly can improve their $VO_2$ max only by about 10 percent with additional training. The advantages of training on $VO_2$ max are lost within two to three weeks after training stops.

Aerobic capacity varies from person to person at any given age. This is attributable to factors such as genetic endowment, body weight and level of physical activity. Working in extreme temperatures, either hot or cold, can reduce $VO_2$ max. Smoking may or may not affect aerobic capacity. According to Dr. Lind, recent research seems to indicate that smoking does not decrease $VO_2$ max absent pathological complications, but Dr. Arthur Leon, an expert for the plaintiff, stated that smoking was as powerful in decreasing $VO_2$ max as aging.

In Dr. Lind's opinion, testing for aerobic capacity on an individual basis was not feasible because formulation of a test relevant to the particular jobs of the wildlife officer would be difficult. Dr. Lind cited the difficulty of deciding the amount of time which should be alloted for the completion of a given task while retaining an acceptable level of quality control as an example of an arbitrary decision which would detract from the inferred accuracy of the tests and which would foster litigation. In addition, testing cannot simulate life-threatening situations where high energy expenditures, fast reflexes, strength, and reaction time are demanded and where stress is an added factor.

Dr. Lind's opinion was based on two different site visits to Tennessee in all three areas of the State. During these visits, he interviewed 20 to 30 wildlife officers regarding their job duties and reviewed various documents provided by TWRA. TWRA's other expert, Dr. Albert Antlitz, also made site visits in both East and West Tennessee and interviewed officers in Nashville.

Dr. Antlitz discussed the connection of coronary artery disease and the performance of a job such as that of the wildlife officer. Coronary artery disease begins as early as the twenties and progresses at differing rates with age. Most individuals over age 30 have some amount of coronary artery disease. Age does not cause coronary artery disease, but there is a correlation between age and coronary artery disease.

Peak energy demand for oxygen by the body can cause a cardiac event if there is a significant obstruction in the artery which restricts the flow of blood. Thus, aerobic capacity and the degree of coronary artery disease are interrelated. The heart muscle, unlike other muscles, cannot go into an anaerobic state to perform a task because the heart muscle has no energy reserve and simply stops when the demand for oxygen is greater than the supply. In times of stress, such as sudden exertion in cold or hot weather or during a physical confrontation, latent coronary artery disease presents a danger that the officer's adrenaline response may mask fatigue and push the body into total body collapse or cause a myocardial infarction or arrhythmia. Occlusions in an artery cause reduction in the flow of blood. Fatality can result if a blood clot which causes a total blockage of a coronary artery forms at the site of an occlusion.

Research data introduced by Dr. Antlitz supported the conclusion that 20 percent of apparently healthy men will have a myocardial infarction by age 60. Many more men will have pre-symptomatic signs such as angina and mild ischemia.

Dr. Antlitz testified that the presence of a significant narrowing of one or more coronary arteries creates the possibility of a coronary event. He also testified that by age 55 as much as 70 percent of a general

asymptomatic population will have at least a 50 percent obstruction of at least one coronary artery. An obstruction of less than 50 percent can be equally dangerous to the individual who is called upon to exert himself beyond his usual capacity.

A 50 percent obstruction of a coronary artery is recognized as a significant predictor of the future coronary events. There are other risk factors, however, which are also predictors of coronary events. Some of these risk factors, such as lipoprotein profile, coronary anatomy, gender, age, and metabolic factors, cannot be modified. Other factors, such as smoking, serum cholesterol, high blood pressure, obesity, glucose tolerance, and physical inactivity, can and should be modified. Nevertheless, age and male sex are the most powerful predictors, according to Dr. Antlitz, who believed that risk factor analysis has a very limited use in predicting the presence of coronary artery disease and was most helpful in predicting disease in persons in their 30's and 40's. Of course, all 55 year olds are not at the same risk of having coronary artery disease.

The mortality rate from coronary artery disease also appears to be declining in the United States. In part, this decline can be attributed to improved medical care for coronary events, but more importantly, the decline can probably be associated to changes in the prevalence of the major risk factors in the United States, including reduction in the mean serum cholesterol level, decline in the per capita consumption of cigarettes, and an increase in the detection and treatment of hypertension. Although mortality from coronary artery disease may be declining in this country, coronary artery disease still poses a significant threat to persons over age 55.

The nonintrusive tests available to predict coronary artery disease are not accurate predictors among an asymptomatic population in Dr. Antlitz's opinion. The exercise treadmill test will not detect over 50 percent of the individuals who have the disease. At least 10 percent of those persons with coronary artery disease who take the treadmill test will have a false normal reading. Even the combination of the treadmill test and risk factor analysis is not an accurate predictor of coronary artery disease according to Dr. Antlitz, who does not feel that any battery of tests or laboratory situations which do not recreate life-threatening and stressful situations can accurately predict coronary artery disease.

Dr. Antlitz expressed the opinion that a lack of physical fitness has not been shown to be a cause of coronary artery disease. He stated that research may prove that physical exercise is a factor that has an impact on acceleration of the disease, but the relationship between physical exercise and coronary artery disease has not been proven. Dr. Antlitz also testified concerning the difficulties in motivating persons to use enough discipline to change lifelong habits.

Dr. Paul Davis, one of the plaintiff's two experts, testified concerning the ability to slow the decline in aerobic capacity through physical training and also concerning the ability to test for a person's capacity to perform the job of wildlife officer. While Dr. Davis agreed with Dr. Lind that there is about a 9 percent decrease in $VO_2$ max per decade, Dr. Davis felt that the decline in $VO_2$ max with age could be slowed by regular exercise. Dr. Davis felt that few of the wildlife officers would possess a $VO_2$ max of 3.0 liters per minute at any age. Dr. Davis also believed that aerobic capacity is not as important in the job of wildlife officer as that of firefighter, on which he has done greater study. Dr. Davis has found that age is one of the six or so best predictors for the ability of firefighters to perform their jobs, but he testified that the duties of wildlife officers did not require the same level and length of physical exertion as firefighting, and hence, he doubts that age is as good a predictor for wildlife officers. In Dr. Davis' opinion, age alone is not a valid BFOQ for mandatory retirement of wildlife officers, but a valid BFOQ may be established by recognized scientific methods of testing.

Dr. Davis believes that it is possible to test to determine who over age 55 could do the job of wildlife officer. As an example,

he cited his work with the Sheriff's Department in Jacksonville, Florida, which he testified was similar to his work with firefighters in the Washington and Baltimore areas. The tests, which he developed for the Jacksonville Sheriff's Department, however, were entry-level screening tests which resulted from a Title VII sex discrimination case. In developing these tests, he relied on EEOC guidelines applicable to Title VII sex discrimination cases, but not to ADEA cases. He set minimal entry level standards on the basis of tests of a randomly selected group of Jacksonville officers. These standards screened only for physical limitations.

In forming his opinion, Dr. Davis made no site visits to Tennessee, nor did he interview any Tennessee wildlife officers. His opinion was based on hearing testimony of several officers and former officers in court and on his familiarity with the duties of wildlife officers in Wyoming. Dr. Davis owns 90 percent of the stock in the Institute for Human Physical Performance. This Institute derives roughly one-third of its monies from testing or the development of tests similar to the ones proposed for TWRA by Dr. Davis.

The plaintiff's other expert, Dr. Arthur Leon, a practicing cardiologist who does research in heart disease and exercise, testified that high cholesterol, high blood pressure, diabetes and smoking increase the probability of coronary artery disease. Age also increases the probability of developing coronary artery disease. Dr. Leon expressed the opinion that if people controlled those risk factors, such as smoking, which are modifiable, and engaged in regular physical exercise, which was defined as 20 minutes of exercise at 60 percent aerobic capacity four times a week, the incidence of coronary artery disease would decrease.

Dr. Leon stated that there is a great variability in the rate of aging and that functional age is a better predictor of physical work capacity than chronological age. Functional age, which is obtained by a comparison of a person's health, vigor and physiological functions with the norms of persons of different ages, is affected by factors other than chronological age, such as genetics, level of physical activity, other life habits and the presence or absence of vascular disease. But functional age is difficult to validate and would involve a longitudinal study, job performance measures, and illness, injury and retirement statistics. Nevertheless, Dr. Leon expressed the opinion that risk factors, such as family history, diet, physical fitness, high blood pressure, high cholesterol, and smoking, are easy to measure and are better predictors of coronary artery disease than age. Dr. Leon also testified that although the number of persons over age 65 has doubled since 1950, the incidence of coronary artery disease has declined by 30 percent. He attributed this decline to a change in risk factors that have occurred in the American population, such as reduced cholesterol levels, decreased smoking and increased physical activity. To support his conclusion, Dr. Leon cited a study done on 100,000 workers of the DuPont Company from 1957 to 1983.

Dr. Leon relied on two articles by Dr. Robert Bruce who conducted the Seattle Heart Watch Study. In a 1983 article, Dr. Bruce found that a chronological age of 55 is a very significant risk factor in men and that coronary artery disease event rates are significantly higher in persons over the age of 55. Dr. Bruce's research showed that 14.7 percent of people under age 55 had signs of clinical coronary artery disease and 85.3 percent of people over age 55 had signs of clinical coronary artery disease. In fact, most individuals over age 30 have some amount of coronary artery disease. Pathological studies of young soldiers killed in the Viet Nam and Korean conflicts revealed large amounts of coronary artery disease.

Dr. Leon testified that a 50 percent occlusion in a single artery was a benign lesion and that one artery occlusion was not significant. According to Dr. Leon, a 70 percent narrowing is necessary to restrict blood flow during exercise and a 90 percent narrowing is necessary to decrease blood flow at rest. But there is no noninvasive way to determine the exact degree

or location of a blockage in an artery. Cardiac catherization, which is an invasive and somewhat dangerous test, is the only exact predictor of coronary blockage. Exercise treadmill tests, which are commonly used to predict coronary artery disease, have a sensitivity range of between 58 and 67 percent when conducted on an asymptomatic population. This means that only 58 to 67 percent of those persons with a positive test actually have coronary artery disease. Of those persons with a negative exercise treadmill test, 90 percent would not have coronary artery disease, but ten percent who do have coronary artery disease would be undetected by the test. Dr. Leon also testified that an update on the Framingham study, which was the basis for the American Heart Association Handbook data, concluded that the incidence of myocardial infarction increased rapidly beyond the age of 45 in men. One-third of these myocardial infarctions were unrecognized and over one-half of that number had no preinfarction symptoms.

Dr. Leon also cited several studies in which persons increased their $VO_2$ max by increasing their activity status. He testified that the results of these studies showed that although $VO_2$ max decreases with age, there is leeway to increase or decrease it at any age by changes in health habits. According to Dr. Leon, the Mr. Fit Study showed that leisure-time activity, relative weight, and cigarette smoking were as powerful or more powerful predictors of a person's $VO_2$ max than age.

Dr. Leon based his opinion on testimony of several of the wildlife officers, the wildlife officer's job descriptions, the results of the questionnaires completed by the officers and his personal knowledge of the wilderness.

Dr. Earl Ferguson is a cardiologist and exercise physiologist who is a Colonel in the United States Air Force. His primary research interest is in exercise physiology, with emphasis on the effects of exercise and conditioning on atherosclerosis and heart disease and on endocrine function. In another order and accompanying memorandum, the court has ruled that Dr. Ferguson's former testimony in the cases of *Johnson v. Mayor of Baltimore*, Defendant's Exhibit 40, and *Roy Day v. City of Moose Jaw, Saskatchewan*, Defendant's Exhibit 41, is admissible as evidence in the trial of this case under Rules 804(a)(5) and 804(b)(1) of the Federal Rules of Evidence. A summary of Dr. Ferguson's testimony in those cases is given below.

Dr. Ferguson testified that a person's aerobic capacity is a function of many factors. He considered heredity as one of the strongest of these factors. Sex and age were also among those unalterable factors which have the greatest influence on the ability to consume oxygen. Dr. Ferguson agreed with the other experts that there is a significant and progressive decrease in the ability to consume oxygen with exercise as people get older. In fact, aerobic capacity peaks about age 18 to 20.

Training does play a role in the ability to consume oxygen during exercise, but Dr. Ferguson cautioned that in comparing the aerobic capacity of well-trained athletes to that of normal individuals, both heredity and self-selection must be considered as factors. Self-selection may play a significant role in the aerobic capacity of athletes in that those persons who genetically have better aerobic capacity may self-select to be athletes. With training, a person can increase his $VO_2$ max about 15 to 20 percent.

Dr. Ferguson testified that there is a clear change in the left ventricular ejection fraction and its response to exercise as persons age. The left ventricular ejection fraction measures the amount of blood that the heart ejects with each beat. With exercise, the amount of blood the heart pumps increases, but the left ventricular ejection fraction clearly decreases with age and this may be one of the causes of the decrease in aerobic capacity with age. There is also a clear difference in the ejection fraction of normal healthy persons who are less than 60 years of age and that of normal healthy persons over 60. In research reviewed by Dr. Ferguson, the ejection fraction actually decreased with exercise in persons over 60. Dr. Ferguson concluded that the percent-

age of persons with an abnormal ejection fraction increases with age.

Dr. Ferguson reviewed research that establishes that 75 percent of those persons in the decade from 50 to 59 have at least one coronary lesion that is 50 percent or greater, but only about 18 percent of those persons in the decade from 30 to 39 have a 50 percent narrowing of the coronary artery. Dr. Ferguson characterized an occlusion of 50 percent or greater as a significant occlusion. Thus, there is a marked increase in the incidence of significant coronary lesions as individuals age. Dr. Ferguson testified that research demonstrates that cardiovascular function decreases with age and the incidence of coronary atherosclerosis increases with age.

Performance testing measures an individual's maximum oxygen consumption or determines an individual's ability to perform certain tasks, such as push-ups, sit-ups, or running distances. According to Dr. Ferguson, detection of coronary artery disease by performance testing is virtually impossible in the majority of asymptomatic persons. The first indication of coronary artery disease in almost half of the asymptomatic individuals is either sudden death or heart attack. Performance testing can measure $VO_2$ max or ventricular function in laboratory conditions which are strictly controlled, but to determine what the actual functions of an individual are under very stressful conditions with other variables present, such as extremes in temperature, humidity and excitement, is much more difficult.

Dr. Ferguson reviewed the research of Froelicher, who studied coronary disease in completely asymptomatic persons. Froelicher found that the sensitivity of exercise tests was between 58 and 67 percent. This means that only two-thirds of the asymptomatic persons who had coronary artery disease were detected by exercise stress testing. Dr. Leon, one of the plaintiff's experts, agreed that the sensitivity of the treadmill test is only between 58 and 67 percent. Sensitivity is the ability to detect coronary disease in persons known to have the disease.

The specificity of the exercise treadmill test is the capacity of the test to determine who does not have the disease. The research data indicates that 10 percent of the individuals who receive a positive stress test do not have coronary artery disease. Thus, the predictive value of exercise treadmill tests range from 13.6 to 48 percent. Predictive value means the value of a positive test. If the predictive value of the test is 13.6 percent, then only 13.6 percent of those persons with a positive stress test have coronary artery disease. Dr. Ferguson concluded that there is no reliable way to detect coronary artery disease accurately in an asymptomatic population through exercise testing.

Dr. Ferguson also reviewed the Seattle Heart Watch Study of Dr. Robert Bruce, who combined exercise testing with the identification of risk factors. Dr. Ferguson pointed out that even with this very carefully screened population of over 2,000 clinically healthy men, Dr. Bruce was only able to identify one percent of those men who were at a high risk level of having a coronary event within five years. Only 33 percent of that one percent had a coronary event within five years.

Dr. Ferguson pointed to Dr. Bruce's study as support for his position that there is a marked increase in coronary events in persons age 55 and older. Of all risk factors evaluated in the Seattle Heart Watch Study, age was the strongest risk factor in terms of predictive value.

Dr. Ferguson recognized the importance of a screening program for finding persons that are at a high risk level for coronary artery disease and the importance of attempting to modify the risk factors. He also endorsed routine rigorous physical examinations and requirements that individuals be at ideal body weight and not smoke. Dr. Ferguson also testified that even with a situation in which modifiable risk factors have been ideally controlled, latent coronary disease or asymptomatic disease cannot be reliably detected in order to prevent persons from dying during rigorous physical activities. Dr. Ferguson concluded that research supports setting a mandatory re-

tirement age at 55 for jobs involving the public safety and vigorous physical activity.

### Conclusions of Law

The EEOC has established a prima facie case of age discrimination as prohibited by the ADEA in that TWRA does not contest that its mandatory retirement policy is one that is solely age based. Thus, the burden of proof falls upon the TWRA to establish that mandatory retirement at age 55 is a BFOQ for wildlife officers.

### I.

The Court expressed its deep concern on several occasions during the trial of this case that the State of Tennessee asserts that mandatory retirement at age 55 is a BFOQ for wildlife officers but does not consistently adhere to its avowed policy. Wildlife officers are retired at age 55 only if they also have twenty-five (25) years of service.[6] Thus, those hired after age 30 can work beyond 55 without an extension. The Wildlife Resources Commission has also granted extensions to seven (7) persons since 1979 with the latest extensions being granted on July 1, 1985, only twenty-one (21) days prior to the commencement of this trial.

The Court has not found case law which specifically considers the point it raised, that is whether the State can assert that retirement at age 55 is a BFOQ and yet not require all wildlife officers to retire at age 55. In *Mahoney v. Trabucco*, 738 F.2d 35 (1st Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984), the Court of Appeals for the First Circuit examined mandatory retirement at age 50 as a BFOQ for state police officers. The statute at issue in that case provided for retirement upon "attaining age fifty or upon the expiration of" " 'twenty years (of service), whichever last occurs.' " *Id.* at 36 n. 1. The First Circuit noted that "the practical effect of this statute (was) to require ... (retirement) at 50," since another statute

set 30 as the maximum age for recruits. *Id.*

The Supreme Court has ruled that the fact that federal firefighters must retire at age 55 does not establish 55 as a BFOQ for nonfederal firefighters, nor is it relevant to the question of a BFOQ for nonfederal firefighters, *Johnson v. Mayor of Baltimore*, 472 U.S. 353, 369–70, 105 S.Ct. 2717, 2726, 86 L.Ed.2d 286, 299 (1985); nevertheless, this Court notes that the federal statute provides for retirement of federal firefighters at 55 or when twenty (20) years of service has been completed. 5 U.S.C. § 8335(b). Although this Court can not infer from the statute governing federal firefighters that such inconsistencies in application can be overlooked, it is instructive that the pair of age and years of service is not an unusual combination. Clearly, such requirements deal with the necessary vesting of pension plans and a tie of age and years of service may be impossible to eliminate totally.

Gary Myers, Executive Director of TWRA, did testify that the agency rarely hires wildlife officers after age 30. While this practice is in itself fraught with questions of age discrimination, this issue is not before the Court. The practical effect, as in *Mahoney*, is that few officers reach retirement age without the necessary years of service.

The Tennessee mandatory retirement statute is also troublesome in that it allows the Tennessee Wildlife Resources Commission to grant extensions to officers after age 55. The extensions that have been granted were not based on the abilities of the individuals to perform their jobs but rather on political considerations and the Commission's concern for the economic status of an individual wildlife officer. If these extensions had been founded on the physical abilities of the officers to do their jobs, then the Court would have had no option but to find that individual determinations of physical ability to perform as wild-

---

6. The Court accepts the State's position that although those wildlife officers hired after July 1, 1976, appear to be in group I for retirement purposes, the specific statute governing retirement of wildlife officers controls and not the more general statute. Thus the Court finds that it is the State's policy to retire wildlife officers at 55 with the exceptions noted above.

life officers were indeed possible. None of the testimony, however, shows physical ability to have ever been considered by the Commission. The Court finds the political pressures brought to bear on the Commission in order to obtain an extension abhorrent, but it does not find that the granting of extensions defeats the State's assertion of a BFOQ where the issues considered in the granting of an extension are not related to the job. *See, EEOC v. Missouri State Highway Patrol,* 748 F.2d 447, 449 n. 3 (8th Cir.1984). (The Patrol Superintendent could grant extensions and did so for short periods where retirement benefits would be favorably affected by pending legislation.) *See, EEOC v. City of Janesville,* 630 F.2d 1254, 1256 (7th Cir.1980). (The City could grant one-year extensions to mandatory retirement at age 55 if "compulsory retirement would create a hardship for the employee that could be alleviated within one year or where a one-year extension would help resolve management problems for the City".)

Thus, the State may assert mandatory retirement at 55 as a BFOQ for wildlife officers, although its statute and practice are somewhat inconsistent with its position.

## II.

Before considering whether mandatory retirement at age 55 is a BFOQ for wildlife officers, the Court must determine whether it should apply the test for a BFOQ as established in *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224 (5th Cir.1976) and cited with approval in *Western Airlines, Inc., v. Criswell,* 472 U.S. 400, 413–18, 105 S.Ct. 2743, 2751–53, 86 L.Ed.2d 321, 333–35 (1985) to the general category of wildlife officers or whether it should apply the test to one or more of the four (4) classifications of wildlife officers separately. The ADEA provides that "(i)t shall not be unlawful for an employer ... to take any action otherwise prohibited ... where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." 29 U.S.C. § 623(f)(1). Thus, the issue becomes whether the Court should view law enforcement as done by wildlife officers as a par-

ticular business and ignore the different levels of enforcement duties within the different jobs done by those classified as wildlife officers or whether the Court should look to the different job assignments in applying the test for a BFOQ.

The Circuits are divided on the approach that should be used in evaluating a BFOQ defense where there are distinct duties for different jobs within a "particular business." The Seventh Circuit in *EEOC v. City of Janesville,* 630 F.2d 1254 (7th Cir. 1980) held that the critical factor was the "particular business" at issue and thus "particular occupations" within a "particular business" should not be afforded special consideration because of differing job duties. At the opposite end of the spectrum, the Eighth Circuit in *EEOC v. City of St. Paul,* 671 F.2d 1162 (8th Cir.1982) focused on "particular occupations" within "particular businesses" and found that fire chiefs should not be considered in the same class as fire captains or firefighters. *See also, EEOC v. City of Minneapolis,* 537 F.Supp. 750, 756 (D.Minn.1982) ("In this case the occupation to which the BFOQ exemption applies is that of a captain of police rather than a generic class such as law enforcement personnel"). The First Circuit has taken an intermediate position, but one that is closer to *Janesville* than *City of St. Paul.* In *Mahoney v. Trabucco,* 738 F.2d 35 (1st Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984), the First Circuit decided "to focus not only on the 'particular business' but also on genuine and well-recognized occupations within such businesses." *Id.* at 42. Accord, *Hahn v. City of Buffalo,* 596 F.Supp. 939, 952 (W.D.N.Y.1984) aff'd 770 F.2d 12 (2d Cir.1985). The Sixth Circuit has not considered this issue.

The *Janesville* approach would make no distinction between those employees with differing duties within a "particular business." *EEOC v. City of Janesville,* 630 F.2d 1254, 1258 (7th Cir.1980). Thus, although the chief of police would have quite different duties from those of a patrolman, he should not be treated differently for the purposes of mandatory retirement as he

falls within the generic class of law enforcement employees. The Seventh Circuit's opinion is founded on the "plain meaning of the term 'particular business,'" which it did not consider to be "susceptible to interpretation." *Id.* at 1258. The *Janesville* Court did not resort to the legislative history of the ADEA although it plainly stated that the legislative history did not support an application of the BFOQ defense on a job-by-job basis.

The Eighth Circuit in *EEOC v. City of St. Paul,* 671 F.2d 1162 (8th Cir.1982) found that within a "particular business" such as firefighting, "particular occupations" such as fire chief should be examined separately under a BFOQ defense. The Eighth Circuit held that the plain meaning of "bona fide occupational qualification reasonably necessary to the normal operation of the particular business" is that "age can be considered relevant in an occupation within the particular business." *Id.* at 1165. The Eighth Circuit based its opinion on its finding that the "legislative history shows a congressional intent to require employment decisions to be made on the basis of ability rather than age" and the fact that the Seventh Circuit's generic class of employees approach was inconsistent with decisions based on ability and not age in situations where a person can completely fulfill his own duties, but not the duties of another position in the generic class.

Both the approaches of the Seventh and Eighth Circuits pose serious problems. The generic class determination of the Seventh Circuit presents a question of how to define the proper class and the Eighth Circuit approach could become unworkable if an employer had to consider each specifically defined job position in establishing its BFOQ defense. In recognition of these problems, the First Circuit interpreted "occupational qualification" to mean "a recognized and discrete vocation" rather than a particular job assignment. *Mahoney v. Trabucco,* 738 F.2d 35, 39 (1st Cir.) *cert. denied,* 469 U.S. 1036, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984). Even if the job assignment was of long duration, the Court would not equate a "particular assignment" to an "occupation." *Id.* Thus, the First Circuit found that a state police sergeant who performed administrative duties, but who was subject to reassignment or to special duty assignments at any time and particularly in emergencies should be considered the same as any other member of the uniformed force for mandatory retirement purposes. *Id.* The focus of the First Circuit upon "genuine and well-recognized occupations" in particular businesses seeks to "prevent or remedy indiscriminate lumping" of job positions. *Id.* at 42.

This Court finds the approach of *Mahoney* the most reasonable and thoughtful of the three, but it rejects the contention of the TWRA that *Mahoney* dictates a finding that all wildlife officers should be treated the same for mandatory retirement purposes. *Mahoney* clearly stands for the proposition that for the purposes of establishing a BFOQ administrative or supervisory job assignments in a paramilitary force should not be distinguished from other more strenuous assignments on the basis of their nonstrenuous nature alone. But *Mahoney* does not stand for the proposition, nor would the State of Tennessee advance the proposition, that all employees of an agency should be treated the same for retirement purposes. Obviously, clerical staff and, in the case of the TWRA, biologists and area managers could not be forced to retire because of a BFOQ for those employees routinely involved in law enforcement. Thus, while *Mahoney* would advocate that this Court look to "occupations" rather than "job assignments," the Court need not blindly adhere to the State's characterization of the occupation of wildlife officer without further scrutiny.

█ The Court finds that the positions of wildlife officer I, wildlife officer II and wildlife officer supervisor should be treated as an "occupation" for the purposes of applying the test for a BFOQ, but that the chief of law enforcement (and the assistant chief) should be considered as a separate occupation in the application of the test for a BFOQ. While all classifications of wildlife officers do law enforcement work, the wildlife officers I and II and the supervisors are the ones who routinely perform

law enforcement duties. Although the wildlife officer supervisor performs many administrative duties, the supervisor works approximately three (3) days a week in the field with the wildlife officers I and II. The chief of law enforcement, however, works only on the average of ten (10) days a year in actual law enforcement.[7] His job is purely administrative except for the few days of field duty during peak seasons. Although he is also subject to call in emergency situations such as prison riots, and could be transferred into one of the other classes of wildlife officer, the Court finds that the job of chief is distinguishable as an occupation from that of the other classes of wildlife officer. While the almost purely administrative role of chief of law enforcement is an important factor in the Court decision, the critical factor in the Court's decision is that the chief of law enforcement is not in the regular chain of command in law enforcement. The chief functions as an advisor to the executive director and staff of TWRA. The regional managers, who are not subject to mandatory retirement at age 55, are responsible for directing law enforcement activities throughout the State. Thus, although TWRA argues that having a chief who has come up through the ranks and is subject to the same mandatory retirement is important for morale, TWRA has failed to show why regional managers who have direct responsibility in law enforcement should be distinguished from the chief of law enforcement for retirement purposes. The Court concludes that the chief of law enforcement should be considered separately for the purposes of applying the test for a BFOQ.

Likewise, the Court finds that the assistant chief should be considered an "occupation" different from that of wildlife officers I and II and wildlife officer supervisor. The duties of the assistant chief, when this position was held by George Tucker Brown, were purely administrative and involved no field duty. This job was also not in the chain of command in law enforcement.

### III.

The State has asserted that its mandatory retirement age of 55 is a bona fide occupational qualification for the job of wildlife officer. The Court has determined that for purposes of analyzing the BFOQ defense, the position of chief of law enforcement[8] must be considered separately from the other three positions of wildlife officer I, wildlife officer II, and wildlife officer supervisor.

 The ADEA permits an employer to assert the affirmative defense that its age-based employment decision is "a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." 29 U.S.C. § 623(f)(1). *See EEOC v. Wyoming*, 460 U.S. 226, 229, 103 S.Ct. 1054, 1056–57, 75 L.Ed.2d 18, 24 (1983). (The BFOQ is an affirmative defense requiring proof of a factual basis for believing that the age classification is not unreasonable or arbitrary.) The Fifth Circuit established a two part inquiry which is to be undertaken in the evaluation of a BFOQ defense. *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 235–36 (5th Cir. 1976). This test, which was cited with approval by the United States Supreme Court in *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 413–18, 105 S.Ct. 2743, 2751–53, 86 L.Ed.2d 321, 333–35 (1985), requires that the defendant show first that "the job qualifications ... must be reasonably necessary to the essence of (the) business," *Tamiami*, supra 531 F.2d at 236; and second that it "had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all persons over the age limit would be unable to perform safely and efficiently the duties of the job involved," or "that some members of the discriminated-against class possess a trait precluding safe and efficient job performance that cannot be ascertained by means other than knowledge of the applicant's membership

---

7. Biologists and area managers also spend a small amount of time in law enforcement, but they are not subject to mandatory retirement at age 55.

8. The position of assistant chief of law enforcement, as stated above, will be considered together with the position of chief of law enforcement.

in the class." *Id.* at 235. The determination of whether a particular age classification is a BFOQ must be done on a case-by-case basis. *Western Air Lines, Inc., v. Criswell*, 472 U.S. at 411–12, 105 S.Ct. at 2750, 86 L.Ed.2d at 332.

[█] The BFOQ exception to the ADEA is very narrow and the burden on the defendant to establish a BFOQ is generally a substantial one. *Id.*, 472 U.S. at 411–14, 105 S.Ct. at 2750–51, 86 L.Ed.2d at 332. Nevertheless, the Sixth Circuit has held that "(t)he presence of an overriding safety factor might well lead a court to conclude as a matter of policy that the level of proof required to establish the reasonable necessity of a BFOQ is relatively low." *Tuohy v. Ford Motor Co.*, 675 F.2d 842, 845–46 (6th Cir.1982). *See* also *Western Air Lines, Inc., v. Criswell*, supra, 472 U.S. at 419–20, 105 S.Ct. at 2754, 85 L.Ed.2d at 337 ("when an employer establishes that a job qualification has been carefully formulated to respond to documented .concerns for public safety, it will not be overly burdensome to persuade a trier of fact that the qualification is 'reasonably necessary' to safe operation of the business. The uncertainty implicit in the concept of managing safety risks always makes it 'reasonably necessary' to err on the side of caution in a close case."); *Orzel v. City of Wauwatosa*, 697 F.2d 743, 755 (7th Cir.) *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983) ("[E]mployers whose businesses are safety-related are likely to have less difficulty than other employers in establishing that some retirement age below the federally protected limit of 70 qualifies as a valid BFOQ"); and *EEOC v. County of Santa Barbara*, 666 F.2d 373, 377 (9th Cir.1982) ("[E]mployers whose businesses are safety-related have less difficulty proving that age is a BFOQ"). The issue before the Court on a BFOQ defense is whether safety considerations render mandatory retirement at age 55 reasonably necessary.

**A.**

[█] The Court shall first consider whether the mandatory retirement age of 55 is a BFOQ for wildlife officers in the categories of wildlife officer I, wildlife officer II, and wildlife officer supervisor.[9] These officers are routinely engaged in law enforcement at a minimum of three days a week in the field.

The essence of the business of the Tennessee Wildlife Resources Agency as applied to these wildlife officers is two-fold: (1) protection of public safety by the enforcement of boating and hunting laws; and (2) preservation and protection of wildlife by the enforcement of hunting and fishing laws. The testimony of the wildlife officers established that they are responsible for public safety on the water and in the field. Several of the officers who testified gave examples of incidents in which they were required to protect public safety. These incidents included rescues of boaters and water skiers from danger, apprehending speeding and drunken boaters, preventing assaults, preventing hunting accidents by enforcing the requirement that hunters wear blaze orange, and checking for hunters shooting across roads. Although these officers also are often engaged in duties, such as building fish attractors, checking commercial fishing lines, counting game, and checking hunting and fishing licenses, which relate to their responsibilities as to the protection and propagation of wildlife, the Court concludes that the primary essence of TWRA's business as it relates to wildlife officers I and II and wildlife officer supervisors is that of law enforcement and the safety of the public.

Once an employer shows that the essence of its business is safety, the Court must conduct "a particular inquiry into the effect of aging on the ability to perform safely." *Tuohy v. Ford Motor Co.*, 675 F.2d at 844. *See also, Orzel v. City of Wauwatosa*, 697 F.2d at 755. Based on the testimony of past and present wildlife officers, and the testimony of the expert wit-

---

**9.** When the Court uses the term "wildlife officers" in this section, it refers to wildlife officers I, wildlife officers II and wildlife officer supervisors, but not the chief or assistant chief of law enforcement.

nesses, the Court finds that the TWRA has established age 55 as a BFOQ for wildlife officers I and II and wildlife officer supervisors.

The state conducted no scientific studies prior to the adoption of the mandatory retirement age of 55 for wildlife officers and has done little scientific research on the question since the adoption, but testimony did establish that there was considerable concern on the part of those within the agency that older wildlife officers were unable to perform their jobs safely with respect to both the public and themselves. Both George Tucker Brown and Ken Stockdale, during their tenures as chief of law enforcement, took this position. Stockdale's beliefs on this issue were set forth in a memo to Gary Myers. Defendant's Exhibit 10. Although both Brown and Stockdale later changed their opinion upon reaching the mandatory retirement age themselves, the Court credits their original opinion that age 55 is a necessary requirement for the retirement of wildlife officers and finds that their later positions are colored by their own particular circumstances, including the facts that both held less stressful administrative posts at retirement and that the economic feasibility of retirement at 55 had been altered by unforeseen changes in the economy. The Court particularly credits the testimony of retired area supervisor Ray Henry as to the feelings of those within the agency for the need of a mandatory retirement age because many officers would be willing, but unable, to continue to work effectively in their older years. Henry also impressed the Court with his testimony that experience and knowledge could not make up for the decrease in the older officer's physical ability and that, in his own judgment, he could no longer effectively do his job of supervisor. Likewise, younger officers, such as Keith Jones, who is only 42 years old, testified that they could see changes in their own physical abilities. Although witnesses such as Thomas Prvdum, retired wildlife officer and presently sheriff of Lawrence County, testified that they could do the job of wildlife officer after 55 and are currently engaged in strenuous activities, the Court finds these opinions to be individual determinations of an emotional nature that are not subject to validation in any manner. Nor do they, on an individual basis, prevent a finding that the state has a factual basis for believing that all, or substantially all, over 55 cannot safely or efficiently perform the job of wildlife officer.

Evidence that the number of arrests made and the number of citations issued reached the peak in the 41 to 45 age group and then decreased by nearly ten percent each in the age groups 46 to 50 and 51 to 55 further supports the Court's conclusion. Although arrests are somewhat a function of factors not within the officer's control, such as game populations and terrain and do not establish by themselves that older officers are less effective, they do support that conclusion. Likewise, the fact that the average age of the "officer of the year" for ten years is 36 is not conclusive that older officers are ineffective, but does support that conclusion.

The record is filled with examples of the strenuous nature of the work of wildlife officers I and II and wildlife officer supervisors. The Court will not reiterate the few examples which it detailed above. The Court credits the testimony of those officers who felt that the officers over 55 could not adequately perform, without excessive tiring, such tasks as pursuing hunting violators up steep grades on foot, dragging boats through heavy mud, and working long hours in adverse weather. The Court also credits the testimony of supervisors who felt the necessity to consider age when making assignments because of older officers' inability to safely and efficiently perform some of the more strenuous tasks.

■ Although prior judicial determinations that a specific age is a BFOQ in a certain occupation are not controlling in actions under the ADEA, which must be judged on a case-by-case basis, See, Western Airlines, Inc., v. Criswell, 472 U.S. 400, 411–12, 105 S.Ct. 2743, 2750, 86 L.Ed. 2d 321, 332 (1985), the Court's decision is reinforced by the fact that age has been established as a BFOQ for mandatory retirement in a number of safety-related oc-

cupations. *See*, e.g. *Mahoney v. Trabucco*, 738 F.2d 35 (1st Cir.) *cert. denied*, 469 U.S. 1036, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984) (mandatory retirement at age 50 is a BFOQ for state police); *EEOC v. Missouri State Highway Patrol*, 748 F.2d 447 (8th Cir. 1984) *cert. denied*, 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985) (mandatory retirement at age 60 is a BFOQ for highway patrol radio operators); and *EEOC v. Wyoming*, No. C80–0036B (E.Wyo.1983) (after remand by the Supreme Court, a jury found that mandatory retirement at age 55 was a BFOQ for game wardens). But *see, Heiar v. Crawford County*, 746 F.2d 1190 (7th Cir.1984) *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985) (mandatory retirement at age 55 is not a BFOQ for policemen); and *Kossman v. Calumet County*, 600 F.Supp. 175 (E.D.Wis.1985) (mandatory retirement at age 55 is not a BFOQ for deputy sheriffs). Furthermore, a legislative determination that mandatory retirement before age 70 is necessary does not relieve the employer from showing that the requirement is a BFOQ, *EEOC v. Missouri State Highway Patrol*, 748 F.2d at 450, *Accord, EEOC v. City of St. Paul*, 500 F.Supp 1135 (D.Minn.1980), *rev.d in other part*, 671 F.2d 1162, 1167 (8th Cir.1982). The legislative history of the mandatory retirement statute for wildlife officers indicates that the legislators were concerned with the strenuous nature of the job when they passed the act. Thus, the legislative history further buttresses the Court's decision.

The Court finds that the expert testimony also supports the conclusion that substantially all persons over age 55 would be unable to perform safely and efficiently the duties of wildlife officers I and II or wildlife officer supervisors, although it would be unwilling to rule conclusively that substantially all persons over age 55 could not perform the duties of the wildlife officers if it were only presented the expert testimony. All of the experts on both sides of this action have testified at a number of similar trials on the issue of mandatory retirement in law enforcement jobs and all have carefully delineated positions. The Court deplores the expenditure of time and money required to rehash these positions for each contest over a mandatory retirement statute of a state or municipality when the testimony is simply reiterated with little or no alteration for the individual case at hand. The Court recognizes, however, that each action under the ADEA must be considered on a case-by-case basis; *see, Western Airlines, Inc., v. Criswell*, 472 U.S. 400, 411–12, 105 S.Ct. 2743, 2750, 86 L.Ed. 2d 321, 332 (1985); and that each job, whether firefighter, police officer or wildlife officer, in each location poses a different set of circumstances.

The testimony of Dr. Lind and Dr. Antlitz was based on actual visits to Tennessee with observations of the terrain and interviews with Tennessee wildlife officers. Dr. Lind and Dr. Antlitz also heard the testimony of several of the wildlife officers, as did Dr. Davis and Dr. Leon. The Court credits Dr. Lind and Dr. Antlitz with a better perception of the rigorous nature of the duties of Tennessee wildlife officers. Moreover, the Court finds that while Dr. Davis and Dr. Leon assert that substantially all persons over age 55 could perform the duties of wildlife officers, these positions are based on the assumption that wildlife officers will have the dedication to train physically and to refrain from habits such as smoking which could result in adverse health conditions. In reality, as several officers testified, their dietary habits and attempts at physical training suffer from the long hours that they are called upon to serve, and most find it difficult to maintain a regular program of exercise. Some officers smoke and have other health-threatening habits. There was no showing that substantially all wildlife officers are dedicated to maintaining physical fitness because of their positions, although there was some evidence that the nature of the job itself helped the officers to maintain fitness.

None of the experts disagreed that aerobic capacity declines with age, but there was disagreement as to the aerobic capacity needed to perform the job of wildlife officer, as well as the meaningfulness of aerobic capacity as a measure of fitness

appropriate to the job. There was also disagreement as to the definition of coronary artery disease and to the extent this disease is present in persons over age 55. The Court believes, after hearing the accounts of the wildlife officers of their strenuous activities, that aerobic capacity is an important measure of capability to do this job, that Dr. Lind's estimate of 3.0 liters of oxygen per minute is reasonable and that few persons over age 55 possess that level. This opinion was largely unrebutted by Dr. Davis and Dr. Leon. Moreover, the Court finds that coronary artery disease is a significant health factor in persons over age 55 which would preclude substantially all such persons from performing the job of wildlife officer safely and efficiently.

The Court is also unconvinced from the testimony of Dr. Davis or Dr. Leon that medical science has advanced to a state that those over age 55 can effectively be screened for coronary artery disease without resorting to invasive measures. While Dr. Davis touts fitness testing, such as that performed by his Institute for Human Physical Performance, as a method of screening for those who are incapable of performing the job of wildlife officer, the Court concludes from all the relevant testimony that tests such as the exercise treadmill cannot at this time reliably determine those who can effectively and safely perform as wildlife officers and that age is the only means to ascertain those persons who can.[10]

Since no known tests can recreate life-threatening or other stressful situations in the laboratory, the Court cannot conclude that coronary artery disease, or even aerobic capacity, can be accurately predicted so that persons performing the job of wildlife officer can be screened by factors other than age.

The EEOC urges in a supplement to its closing argument that because TWRA does not require its wildlife officers to undergo health or fitness checks after those administered at the time of hiring, TWRA is precluded from using age 55 as its mandatory retirement age. The EEOC argues that there may be officers under age 55 who are not qualified to work as wildlife officers. The Court, by common sense and knowledge of human nature, would agree that in all likelihood some wildlife officers under age 55 are not physically capable of performing all of the duties that wildlife officers should. Although there possibly are persons younger than age 55 who are unfit and who are working as wildlife officers, the Court's conclusion that substantially all those over age 55 cannot perform the duties does not fail, nor does the conclusion that age is the only means that now ascertains reliably coronary artery disease, which precludes safe and efficient job performance. Moreover, although requiring periodic physicals and fitness tests would certainly not be harmful, the Court has found that such tests would not determine those wildlife officers who possess coronary artery disease which would preclude safe and efficient job performance.

Thus, the Court concludes that age 55 is a BFOQ for the mandatory retirement of wildlife officers I, wildlife officers II, and wildlife officer supervisors since the evidence shows that substantially all persons over age 55 cannot safely and efficiently perform the duties of wildlife officers and also that there is no means of ascertaining those wildlife officers who would be precluded from safely and efficiently performing the job because of coronary artery disease except by the use of age.

### B.

■ The Court now turns to the question of whether mandatory retirement at age 55

---

**10.** As pointed out during the trial of this case, medical science is not static and in the future scientists may, and probably will, perfect tests that will determine with exacting preciseness the state of a person's health and his or her ability to perform a given job. If such developments do occur, then a specified age will no longer be a BFOQ for mandatory retirement and courts will not be called upon to decide cases such as this one, which end in seeming injustice for those few who have practiced good health and exercise habits and who have been fortunate to have excellent genetic endowments.

is a BFOQ for the position of chief of law enforcement and the assistant chief of law enforcement. The Court concludes that it is not.

The record is devoid of any showing that the chief or assistant chief is called upon to perform duties which are more strenuous than those of area managers or biologists who are not subject to mandatory retirement. The chief does work about ten days in the field, but testimony also showed that biologists and area managers do some law enforcement work. The chief and the assistant chief hold sedentary, administrative positions, and while the persons in these positions could be demoted or called on in an emergency, they moved out of the direct chain of command when they were promoted to chief or assistant chief. A regional manager, who has come from the law enforcement ranks and who has direct authority over wildlife officers, is not subject to mandatory retirement at age 55 and obviously if demoted would return to the ranks of law enforcement. The Court finds that there has been no showing that the chief or the assistant chief need possess the same aerobic capacity as those officers in the field or that coronary artery disease is as important a consideration in these positions. Thus, the Court concludes that all, or substantially all, persons over age 55 could perform these jobs.

Thus, the Court finds that mandatory retirement at age 55 is a BFOQ for the positions of wildlife officer I, wildlife officer II, and wildlife officer supervisor, but not for the positions of chief or assistant chief of law enforcement.

An appropriate order in accordance with this memorandum will be entered.

### ORDER

In accordance with the memorandum contemporaneously filed, the Court finds that age 55 is a bona fide occupational qualification for the retirement of wildlife officers I, wildlife officers II and wildlife officer supervisors, but that age 55 is not a bona fide occupational qualification for the retirement of the chief of law enforcement or the assistant chief of law enforcement.

Thus, the State of Tennessee, Tennessee Wildlife Resources Agency, may continue to retire mandatorily wildlife officers I, wildlife officers II and wildlife officer supervisors at age 55 according to the applicable statutes, but it is enjoined from requiring persons holding the positions of chief of law enforcement or assistant chief of law enforcement to retire at age 55.

Pursuant to the Court's order of June 17, 1985, the trial of this case was bifurcated and, hence, the issue of individual relief as to those persons who were forced to retire at age 55 from the positions of chief of law enforcement or assistant chief of law enforcement remains to be tried. The parties shall confer with each other in an attempt to resolve this issue, and file a joint status report within thirty (30) days of the entry of this order on the docket.

It is so ORDERED.